In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2468

BETHANY PHARMACAL COMPANY,
INCORPORATED,

Plaintiff-Appellant,

v.

QVC, INCORPORATED,

Defendant-Appellee.


Appeal from the United States District Court
for the Central District of Illinois.
No. 98 C 2058--David G. Bernthal, Magistrate Judge.


Argued November 30, 2000--Decided February 23, 2001


    Before RIPPLE, MANION and KANNE, Circuit Judges.

    RIPPLE, Circuit Judge.  Bethany Pharmacal
Company, Inc. ("Bethany") brought this action
against QVC, Inc. ("QVC"). It claimed that QVC
had agreed to allow Bethany to appear on QVC's
televised shopping program in order to sell its
skin moisturizer. QVC moved for summary judgment.
Bethany responded to QVC's motion and also sought
leave to amend its complaint to add a promissory
estoppel claim against QVC. The district court
denied Bethany's request for leave to amend and
granted QVC's motion for summary judgment.
Bethany now seeks review of both rulings. For the
reasons set forth in the following opinion, we
affirm the judgment of the district court.

I
BACKGROUND
A.  Facts

    QVC operates a televised home shopping network.
In 1997, QVC conducted a tour that it titled "The
Quest for America's Best--QVC's 50 in 50 Tour"
("the Tour"). The purpose of the Tour was to find
local vendors in each of the fifty states to
appear on QVC's televised broadcast in order to
sell their products. QVC hired Network Trade
Associates, Inc. ("NTA") to serve as its contact
with economic development offices or agencies in
each of the fifty states. NTA, in turn, contacted

the Illinois Department of Commerce and Community Affairs ("DCCA") for assistance in conducting the Illinois leg of the Tour. Roberta Janis was the DCCA employee responsible for the QVC/NTA project. Although Janis' responsibilities dealt primarily with the logistical aspects of the Tour, she self-titled herself the "QVC Project Manager" in her correspondence concerning this project. R.31, Ex.5 at 4-5. At no time, however, did QVC enter into a contract with either DCCA or Janis.

QVC held two trade shows in Illinois in April 1997. The purpose of the trade shows was to choose twenty Illinois vendors who would sell their products on QVC's broadcast. QVC also intended to choose five additional vendors as alternates. Prior to the trade shows, NTA gave Janis the names and addresses of several Illinois vendors. Janis sent those vendors a QVC solicitation packet; the information in this packet listed her as a contact person. In order to participate in the trade shows, vendors had to complete a product information sheet included in the solicitation packet. On that sheet, the vendor described the product that the vendor proposed to sell on QVC's program. The information sheet also included the following written disclaimer:

The data provided on this sheet is for information purposes only. QVC's acceptance of your completed form does not constitute acceptance or agreement that the information you have provided is correct or complete. It is also not a waiver of any of QVC's rights, remedies or defenses with respect to you or your product. Any sales of the product to QVC shall be governed by a purchase order issued by QVC. An authorized QVC Purchase Order is the only valid contract. Verbal statements or discussions do not constitute a commitment to do business and should not be considered as such.

R.31, Ex.6 at 2.

Bethany was one of the Illinois businesses that received a QVC solicitation packet. Bethany is a pharmaceutical company that manufactures a moisturizing skin lotion called Ti-Creme. Bethany's chairman, Jack J. Scott, Sr., completed a product information sheet describing Ti-Creme on behalf of Bethany, in which he indicated that Bethany had 15,000 to 50,000 jars of Ti-Creme available on hand./1 The product information sheet also asked Scott to indicate the "[m]anufacturer lead time required for $10,000 wholesale order"; Scott responded, "On Hand." R.31, Ex.6 at 4.

Scott represented Bethany at QVC's Springfield, Illinois, trade show in April 1997. Janis also attended the trade show and her DCCA business cards were on display at the registration desk. James Plutte and Julie Campbell, both buyers for QVC, were also at the trade show. Plutte and Campbell explained to the vendors that, if their products were selected, they would receive a purchase order from QVC and that the vendors should not do anything until they heard directly from QVC.

Following the trade show, NTA notified Janis that it would send her a list of the twenty vendors and five alternates from Illinois that QVC had selected to appear on its broadcast, but it told Janis not to contact any of the listed vendors until QVC had notified the vendors of their selection itself. Apparently, Janis did not receive this list right away. Janis may not have received the list until after QVC had contacted the selected vendors, although the record is not clear on this point. What is clear is that Janis thought QVC had already contacted the vendors by the time she received the list. She therefore prepared a letter that she sent to the twenty participants and the five alternates in which she gave them logistical information about the broadcast and alerted them to a potential shortage in hotel accommodations during the time of the broadcast ("the Janis letter")./2 The Janis letter was printed on DCCA stationery, was addressed to "QVC Participants," congratulated them on being selected to participate in QVC's broadcast, and concluded by stating, "See you at the Fair." R.31, Ex.6 at 6./3 Although the same letter was sent to both participants and alternates, Janis directed her subordinates to attach a "post-it note" to the letters sent to the alternates with the word "Alternate."

In selecting the program participants, QVC chose Bethany as an alternate vendor. However, although Bethany received the Janis letter, it did not receive the post-it note informing it that it was only an alternate rather than a confirmed participant. After receiving the Janis letter, Scott telephoned Janis to thank her for notifying him that QVC had selected Bethany as a participant. The parties disagree as to the content of the conversation that followed. Scott claims that, in response to his call, Janis said, "We'll be seeing you at the show." R.31, Ex.7 at 45. Janis, however, claims that she told Scott that her records indicated that he was only an alternate and that she asked him whether he had received information from QVC indicating that he was a participant. The parties agree, however, that, in the course of the conversation, Janis did not say anything definitive that clearly

would have dispelled Scott's misperception.

Scott claims that, in reliance on the Janis letter, he spent $100,000 to buy 60,000 units of Ti-Creme. This amount was what he predicted he would need on hand to meet the demand for Ti-Creme when QVC's broadcast aired. His calculation was based on a QVC press release describing the financial success of the vendors who had participated in the broadcasts. No one at QVC suggested to Scott that he should purchase additional product or that he would need more than the $10,000 worth of product that he already claimed to have on hand.

B. Earlier Proceedings

QVC eventually learned that Scott's receipt of the Janis letter had led him to believe that Bethany had been selected to participate in the broadcast, but it did not change Bethany's status from an alternate to a participant. Consequently, Bethany filed this breach of contract action against QVC. In Bethany's view, the Janis letter constituted a binding contract between Bethany and QVC; the letter constituted a promise that Bethany would be allowed to sell Ti-Creme on QVC's broadcast. Bethany sought to recover the $100,000 it spent to purchase additional product in reliance on QVC's alleged promise. QVC filed a motion for summary judgment. When Bethany replied to QVC's motion, it also filed a motion seeking leave to amend its complaint to add a promissory estoppel claim.

The district court granted QVC's motion for summary judgment. The court first considered whether Janis was QVC's apparent agent, which would allow her to bind QVC to a contract. The court held that Janis was not QVC's apparent agent because QVC had done nothing to indicate to Scott that Janis had any authority to act on QVC's behalf. The court determined that, because Janis had initiated her contact with the vendors, her conduct did not constitute a manifestation by QVC to third parties that Janis had the authority to transact business on QVC's behalf.

The district court further held that, even if Janis was QVC's apparent agent, there still was no valid contract between Bethany and QVC. It concluded that Scott's belief that the Janis letter was an offer to enter into a contract was not reasonable because the Janis letter did not specify the terms of the purported offer or the identities of the offeror and offeree. The court also concluded that, even if there was a valid contract, Bethany could not establish that the contract had been breached because it could not show that it suffered damages or had a reasonable

basis for computing the damages it claimed to have suffered.

Finally, the court refused to allow Bethany to amend its complaint to include a promissory estoppel claim against QVC. The court determined that Bethany would be unable to succeed on such a claim because the Janis letter did not clearly promise that QVC would allow Bethany to appear on its broadcast to promote Ti-Creme. Additionally, the court believed that Bethany's promissory estoppel claim would fail because Bethany's reliance on the Janis letter in purchasing additional product was unreasonable, given that QVC never had indicated that this purchase would be necessary.

II
DISCUSSION

In appealing the district court's judgment, Bethany submits that the district court erred in concluding that Janis was not QVC's apparent agent and that the Janis letter could not form the basis of a binding contract. Bethany also argues that the district court abused its discretion in refusing to allow it to amend its complaint in order to add a promissory estoppel claim. We shall examine each of these contentions.

A. Breach of Contract

We review de novo the district court's grant of summary judgment in favor of QVC, viewing all facts in a light most favorable to Bethany. See Opp v. Wheaton Van Lines, Inc., 231 F.3d 1060, 1063 (7th Cir. 2000). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant--in this case, Bethany--must show that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e).

Under Illinois' law of agency, an apparent agency exists if (1) the principal consents to or knowingly acquiesces in the agent's conduct, (2) the third party has a reasonable belief that the agent possesses authority to act on the principal's behalf, and (3) the third party relied to his detriment on the agent's apparent authority. See Stathis v. Geldermann, Inc., 692 N.E.2d 798, 807 (Ill. App. Ct. 1998). An agent's apparent authority can only be determined by evaluating the principal's conduct toward the third party. Specifically, the principal must do something to lead the third party to believe that

the agent is authorized to act on its behalf. See Yugoslav-American Cultural Ctr., Inc. v. Parkway Bank & Trust Co., 682 N.E.2d 401, 406 (Ill. App. Ct. 1997). The agent cannot unilaterally create an apparent agency through her own words or conduct. See id.; see also Opp, 231 F.3d at 1065. An apparent agency may arise, however, "from silence of the alleged principals when they knowingly allow another to act for them as their agent." Mateyka v. Schroeder, 504 N.E.2d 1289, 1295 (Ill. App. Ct. 1987). In such a situation, the scope of the apparent agent's authority is determined by the authority that a reasonably prudent person might believe the agent to possess based on the actions of the principal. See id.

Bethany maintains that QVC created the appearance that Janis was its agent by allowing her to correspond with vendors and to act as an intermediary between QVC and the vendors. Bethany further maintains that QVC should be responsible for the consequences of the Janis letter because it knew about the letter but never told Janis not to send it. QVC responds that Janis herself initiated the conduct to which Bethany points, and, therefore, the conduct cannot be attributed to any manifestation or authorization on QVC's part. Additionally, QVC maintains that Bethany's perception of Janis as a QVC agent with the authority to bind QVC to a contract was unreasonable, given QVC's statement on the product information sheet that the only valid contract with QVC was a purchase order.

We cannot accept Bethany's argument. Bethany has not established that QVC took any steps that would make a reasonable person believe that Janis had the authority to contract on its behalf. QVC consistently maintained that the only way in which it would enter a binding contract was through a purchase order issued by QVC. QVC clearly stated this principle in the product information sheet that it distributed to all interested vendors, including Bethany. QVC representatives again stated this principle to the vendors attending the trade show when they verbally reminded the vendors of the importance of a purchase order. Bethany has produced no evidence to demonstrate that QVC ever indicated that Janis or DCCA could contract on its behalf through some means other than a purchase order. Indeed, we can find no evidence in the appellate record that QVC ever indicated to any vendor that someone other than a QVC buyer had the authority to contract on QVC's behalf.

Bethany's argument that QVC created an apparent agency in Janis by allowing her to interact with the vendors on its behalf misses the mark. QVC did allow Janis to work with the vendors by

providing logistical information about the trade shows and the broadcast; however, given QVC's repeated disclaimers regarding the need for a purchase order, that relationship cannot reasonably be interpreted as including the authority to contract on QVC's behalf. Moreover, QVC did not stand idly by and accept the benefits of contracts Janis allegedly had procured on its behalf. Instead, upon realizing that Bethany had misinterpreted the Janis letter, QVC notified Bethany of Janis' error and made clear that Bethany would not be allowed to appear on its broadcast. In short, QVC consistently stated to Bethany that a valid contract could be created only by a purchase order. Furthermore, after learning of Bethany's misperception because of Janis' mistake, QVC consistently maintained that Bethany was only an alternate. Under these circumstances, it was unreasonable for Bethany to believe that Janis had any authority to bind QVC to a contract with a vendor./4

B.  Bethany's Motion to Amend its Complaint

     Although leave to amend a complaint should be freely granted when justice so requires, see Fed. R. Civ. P. 15(a), the district court need not allow an amendment when there is undue delay, bad faith, dilatory motive, undue prejudice to the opposing party, or when the amendment would be futile. See Foman v. Davis, 371 U.S. 178, 182 (1962); see also Perrian v. O'Grady, 958 F.2d 192, 194 (7th Cir. 1992) (quoting Villa v. City of Chicago, 924 F.2d 629, 632 (7th Cir. 1991)). An amendment is futile if the added claim would not survive a motion for summary judgment. See Estate of Porter v. Illinois, 36 F.3d 684, 690 (7th Cir. 1994). We review a district court's decision to deny leave to amend for an abuse of discretion. See Sanders v. Venture Stores, Inc., 56 F.3d 771, 773 (7th Cir. 1995).

     The district court determined that allowing Bethany to amend its complaint to add a promissory estoppel claim would be futile because Bethany would be unable to succeed on that claim. Bethany takes issue with this conclusion. It argues that the Janis letter constitutes an unambiguous promise by QVC to allow Bethany to appear on its broadcast and that Scott relied on this promise to Bethany's detriment by purchasing $100,000 worth of product in order to meet the anticipated demand for Ti-Creme following the broadcast. QVC responds that the Janis letter was not an unambiguous promise, that Bethany's reliance on the Janis letter was unreasonable, that Bethany delayed unduly in seeking the amendment, and that allowing the amendment in the face of Bethany's undue delay would prejudice

QVC.

In order to succeed on its promissory estoppel claim, Bethany would have to prove that QVC made an unambiguous promise, that Bethany relied on that promise to its detriment, and that its reliance was reasonable and foreseeable by QVC. See Quake Constr., Inc. v. American Airlines, Inc., 565 N.E.2d 990, 1004 (Ill. 1990). Bethany has failed to establish that the Janis letter was an unambiguous promise or that its reliance on that letter was reasonable. The Janis letter contains no words of promise or obligation; instead, it merely states that QVC notified DCCA of the vendors it had chosen to participate in the broadcast. Such a statement does not amount to an unambiguous promise on QVC's part to have Bethany promote Ti-Creme on its broadcast. More fundamentally, as we have discussed in the previous section, it was unreasonable for Scott to rely on the Janis letter in purchasing $100,000 worth of Ti-Creme after QVC had stated expressly to Scott and the other vendors that the sale of any product to QVC would be governed by a purchase order. The district court did not abuse its discretion in refusing to allow the amendment on the grounds that it would be futile.

Although the district court based its decision to deny Bethany's request for leave to amend on the ground of futility, we believe the court also could have denied Bethany's request on the ground of undue delay. See Sanders, 56 F.3d at 773-74 (upholding the district court's denial of the plaintiff's motion to amend his complaint on the grounds of undue delay and prejudice even though the district court did not address those issues). Bethany did not seek to add its promissory estoppel claim until after the close of discovery and after QVC had filed its motion for summary judgment./5 The factual basis of Bethany's promissory estoppel claim is virtually identical to the factual basis of its breach of contract claim; therefore, Bethany could have brought the promissory estoppel claim at the time it filed its original complaint if it had prepared for this litigation with the appropriate foresight. Bethany has offered no explanation for waiting until it was faced with a summary judgment motion before attempting to add its promissory estoppel claim. See Kleinhans v. Lisle Savs. Profit Sharing Trust, 810 F.2d 618, 625 (7th Cir. 1987) ("In view of [plaintiff's] failure to adequately explain the unreasonable delay in moving to amend his complaint to state a claim for punitive damages when all of the information necessary to stating such a claim has been available to him for eighteen months, we agree with the judgment and reasoning of the district court that [plaintiff's] motion represents an apparent attempt to avoid the effect of summary judgment

[on his other claims]." (internal quotation marks omitted)). Because discovery already had closed and because QVC already had briefed its summary judgment motion, allowing Bethany to add its promissory estoppel claim would have required additional delays in the resolution of the case to allow QVC to respond to a new theory of liability. We do not require a district court to tolerate such delays. See Cleveland v. Porca Co., 38 F.3d 289, 297-98 (7th Cir. 1994) (holding that the district court did not abuse its discretion in refusing to allow the plaintiffs to amend their complaint when they waited until after discovery had been completed and summary judgment motions had been fully briefed before filing their motion to amend); see also Perrian, 958 F.2d at 195 (stating that long delays before seeking to amend a complaint can burden the judicial system, can defeat the public's interest in a speedy resolution of legal disputes, and can justify a district court's denial of a motion to amend). As an alternate ground for decision, the district court rightfully could have denied Bethany's request for leave to amend its complaint on the ground of undue delay.

Conclusion

The district court properly granted summary judgment. It also acted well within its discretion in denying Bethany leave to amend its complaint to add a promissory estoppel claim. Accordingly, the judgment of the district court is affirmed.

AFFIRMED

/1 Scott later indicated in a deposition that this statement was in error. In fact, Bethany only had 1,500 jars of Ti-Creme on hand. This misstatement is irrelevant to our analysis of the issues in this case.

/2 The record does not conclusively indicate whether anyone from QVC ever saw or approved the Janis letter before it was sent to the vendors. However, QVC, NTA, and Janis had been discussing the potential shortage in hotel rooms mentioned in the Janis letter for several months prior to the time the letter was sent.

/3 Given the importance of the Janis letter to this litigation, we set forth its text in full:

Dear QVC Participants:

Congratulations! We just received the news from QVC identifying the twenty companies who will be

participating in the QVC broadcast in Springfield at the Illinois State Fair on August 9th.

The Department of Commerce and Community Affairs Small Business Division will be preparing a press release and distributing it statewide. When it is ready, we will provide a copy to you for your use.

The broadcast will be held on the first Saturday of the State Fair which usually draws close to 150,000 attendees that day. The broadcast itself will be three (3) hours in length. The actual time for the broadcast is yet to be determined. The site selected for the broadcast is a 40,000 square foot area within the Farm Expo area. The site is in direct proximity to the Fair's main entrance.

Hotel rooms will be filling up fast. A listing of some Springfield hotels is provided to assist you in locating accommodations. A map of the State Fairgrounds is also provided.

Look forward to assisting you during the broadcast. See you at the Fair!

Sincerely,

Roberta Janis
QVC Project Manager

R.31, Ex.6 at 6.

/4 Because we have concluded that Janis was not QVC's apparent agent, she had no authority to bind QVC to a contract with Bethany. Therefore, we need not consider Bethany's contention that the Janis letter was a valid and binding contract.

/5 In fact, Bethany filed its request to amend its complaint on the same day that it filed its response to QVC's summary judgment motion.