Roxann V. HALL, Plaintiff,

v.

**OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL ASSOCIATION LOCAL UNION 143, et al., Defendants.**

No. 99–CV–4044–JPG.

United States District Court,
S.D. Illinois.

Sept. 13, 2001.

---

A. Courtney Cox, Hart & Hart, Benton, IL, for plaintiff.

Richard A. Green, John S. Rendleman, Feirich, Mager et al., Carbondale, IL, for defendant.

### MEMORANDUM AND ORDER

GILBERT, District Judge.

This matter comes before the Court on defendant Operative Plasters' and Cement Masons' International Association ("OPCMIA") Local Union 143's ("Local 143") motion for judgment on the pleadings and for partial summary judgment (Doc. 29). Plaintiff Roxann V. Hall ("Hall") has responded to the motion (Docs. 31 & 32).

## I. Motion for Judgment on the Pleadings

### A. *Standard*

 As with motions to dismiss filed under Federal Rule of Civil Procedure 12(b)(6), judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is appropriate if "it appears beyond doubt that the plaintiff cannot prove any facts that would support [her] claim for relief." *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir.2000) (quotations omitted); *accord Northern Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir.1998). The Court considers the complaint, answer and any written instruments attached to those pleadings, accepts all well-pleaded allegations in the complaint as true and draws all inferences in favor of the plaintiff. *McMasters v. United States, Department of the Navy*, 260 F.3d 814, 817–18 (7th Cir.2001); *Forseth*, 199 F.3d at 368. The Court may also consider a plaintiff's affidavit or brief demonstrating how she could make out a claim consistent with the facts alleged in her complaint, even though the substance of the affidavit or brief is not included in the complaint. *Forseth*, 199 F.3d at 368; *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir.1997).

### B. *The Pleadings*

In her complaint, Hall alleges race discrimination and retaliation under Title VII of the Civil Rights Acts of 1964 and 1991, as amended, 42 U.S.C. § 2000e et seq. (Count 1), and 42 U.S.C. § 1981 (Count 2).

Hall is African–American. On April 17, 1992, she was initiated into and began working in an apprentice program, which was administrated by the Bureau of Apprenticeship and Training ("BAT"), through OPCMIA Local Union 331. At that time, Hall was the only African–American in the apprenticeship program. Because Hall had not been indentured in Local 331's apprentice program and because the BAT had not approved that program, Hall transferred to Local 542. Later, Locals 331 and 542 merged to become Local 143, the defendant in this suit.

When Hall transferred to Local 542, she was the only person enrolled in the apprenticeship program. Subsequently, two white females and more than twelve males entered the program. Hall alleges that the white apprentices were treated more favorably than she was in that they were sent to perform more work than she was, were sent to perform work in her place when she was laid off, and were provided training that she was not.

Hall completed the apprenticeship program on March 11, 1998. On May 5, 1998, she applied to become a journeyperson in Local 143 and was certified as qualified to be a journeyperson. As of the date of the complaint, all qualified white apprentices had received their journeyperson cards,

but Hall had not. On June 1, 1998, Local 143 advised Hall by letter that she had been dropped from the apprenticeship program due to her refusal to work at the Olmstead Lock and Dam Project and that the BAT would not allow her to become a journeyperson. She alleges that she was not made a journeyperson because of her race and because she had filed charges and complaints of race discrimination in the past.

On or about December 14, 1998, Hall filed a charge of race discrimination against Local 143 and against the BAT with the Equal Employment Opportunity Commission ("EEOC" or "Commission"). Hall received from the EEOC a document entitled "Dismissal and Notice of Rights" dated January 12, 1999 (Compl.Ex. A) which stated that the EEOC was dismissing the charge because the respondent was a federal agency. Hall also received a document entitled "Notice of Right to Sue" dated January 25, 1999 (Compl.Ex. B) which stated:

> Less than 180 days have expired since the filing of this charge, but I have determined that the Commission will be unable to complete its process within 180 days from the filing of the charge.... With the issuance of this NOTICE OF RIGHT TO SUE, the Commission is terminating its process with respect to this charge.

Compl. Ex. B. Hall filed this lawsuit on March 8, 1999.

Local 143 argues that Hall's notice of her right to sue is invalid because it was issued within 180 days of when she filed her EEOC charge. Therefore, according to Local 143, Hall has not exhausted her administrative remedies and the Court should dismiss Count I. Hall counters that Local 143 has waived the issue by not raising it in a motion to dismiss before answering the complaint. Alternatively, she argues that it would not be fair to require her to wait 180 days when it is clear than the EEOC will accomplish nothing substantial in that time and that the January 12 "Dismissal and Notice of Rights" dismissed her charge, freeing her to file a lawsuit within 90 days of receiving notice of that dismissal.

The Court notes that this matter is complicated because the two notices attached to and incorporated into the complaint indicate two different EEOC representatives and bear two different charge numbers; the January 12 "Dismissal and Notice of Rights" applies to charge number 210990931, and the January 25 "Notice of Right to Sue" applies to charge number 210990930. Even further complicating matters is the complaint itself, which alleges that Hall filed charge number 2109931 against the defendants in this case. Compl. ¶ 3 of Count 1. It is not surprising that the parties appear to be confused in connection with the current motion as well. Local 143 purports to find fault with the January 12 document, Mot. Jmt. ¶ 2, but quotes the January 25 document, Mot. Jmt. ¶ 4. Even Hall herself tries to merge the two documents in her response to the motion by stating that the EEOC issued both documents on January 12. Resp. Mot. Jmt. at 1.

The Court must make some sense out of these inconsistent filings. Viewing the allegations in the complaint as true and drawing all reasonable inferences in Hall's favor, the Court assumes for the purposes of this motion that paragraph 3 of the complaint contains a typographical error and should read 210990931, that the January 12 document (Compl.Ex. A) dismissed the charge as against the BAT, and that the January 25 document (Compl.Ex. B) terminated the charge as against Local 143.

### C. Waiver

The Court will not find that Local 143 has waived its argument that Hall's case should be dismissed because she failed to exhaust her administrative remedies.

Both parties agree that it is possible to waive the defense. Exhaustion of administrative remedies is a precondition to a Title VII suit but is not a jurisdiction requirement and is therefore subject to the equitable doctrines of waiver, estoppel and equitable tolling. *Ameritech Ben. Plan Comm. v. Communication Workers of Am.*, 220 F.3d 814, 819 (7th Cir.2000), *cert. denied*, 531 U.S. 1127, 121 S.Ct. 883, 148 L.Ed.2d 791 (2001); *Gibson v. West*, 201 F.3d 990, 994 (7th Cir.2000). A Title VII defendant may plead and prove as an affirmative defense a plaintiff's failure to exhaust administrative remedies, but if it does not, a court still has jurisdiction to hear the Title VII suit. *Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir.2001); *see Massey v. Helman*, 196 F.3d 727, 735 (7th Cir.1999) (citing *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir.1997)), *cert. denied*, 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001).

The defendant must raise the defense "specifically and with particularity," Fed.R.Civ.P. 9(c), or he waives it. *Ameritech*, 220 F.3d at 819; *Gibson*, 201 F.3d at 994. However, a defendant's failure to raise the defense *in his initial answer or in a motion to dismiss* is not necessarily fatal to the defense. Under liberal federal pleading amendment standards, a court may allow a defendant to amend its answer to add with the requisite specificity the failure to exhaust affirmative defense and thereby to properly bring the defense before the court. *Belgrave*, 254 F.3d at 387; *see* Fed.R.Civ.P. 15. On the other hand, it is clear that a defendant cannot prevail if he proceeds to trial without raising the argument and then raises it for the first time in a post-trial motion. *Liberles v. County of Cook*, 709 F.2d 1122, 1125 (7th Cir.1983) (citing *Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir.1982)) (holding that defendant waived defense by failing to raise it during the nine-year life of the case and waiting until after judgment to bring it up).

The Court finds that Local 143 has not waived the failure to exhaust affirmative defense by failing to plead it in its initial answer or by failing to argue it in a motion to dismiss. It raised the issue prior to trial and may still properly put the question in issue by amending its answer. A court should allow amendment of a pleading except where there is undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment. *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 860 (7th Cir.2001); *Ferguson v. Roberts*, 11 F.3d 696, 706 (7th Cir.1993). In this case, the Court finds that allowing Local 143 to amend its answer to add the affirmative defense of failure to exhaust administrative remedies is appropriate. It would not cause any undue delay or prejudice any party because the parties agree on the relevant facts and do not need additional discovery on the issue. The issue is purely a question of law. Furthermore, there is no evidence of any bad faith or dilatory motive on the part of Local 143 in waiting until the summary judgment stage to raise the issue, and consideration of the issue will not delay the established trial date. In addition, there is no history of a failure to cure pleadings by prior amendments. Finally, while the defense may not ultimately prevail and in a technical sense may be "futile," the Court is mindful that the Court of Appeals for the Seventh Circuit has not spoken on a key

issue relating to Local 143's exhaustion defense—the validity of 29 C.F.R. § 1601.28(a)(2). To enable the parties to properly present the issue on appeal, if an appeal is taken, the pleadings at the trial level should reflect this issue as considered on the merits, not simply in connection with the Court's discretionary determination about whether amendment should be allowed. For these reasons, the Court hereby **ORDERS** that Local 143 shall have up to and including September 28, 2001, to amend its answer to include the affirmative defense of exhaustion of administrative remedies. The Court will now consider the substance of Local 143's argument.

### D. *Analysis*

The Court finds that Hall may be able to prevail on Count 1 of her complaint and that therefore Local 143 is not entitled to judgment as a matter of law.

### 1. *Statutory and Regulatory Scheme*

Title VII requires a plaintiff to present her Title VII claims to the EEOC before filing a federal lawsuit. 42 U.S.C. § 2000e–5(f)(1); *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 763 (7th Cir. 2001). Title VII orders the EEOC to serve notice of the charge on the respondent and to investigate the charge. § 2000e–5(b). As promptly as possible, the EEOC must determine whether there is reasonable cause to believe the charge is true. *Id.* If the EEOC does not find such reasonable cause, it must dismiss the charge; if it finds reasonable cause, it must endeavor to eliminate the unlawful practice through conference, conciliation or persuasion. *Id.* If reconciliation efforts are unsuccessful thirty days after the charge is filed, the EEOC may file a federal lawsuit. § 2000e–5(f)(1). If the EEOC does not file a lawsuit, the aggrieved party may herself sue the respondent of her charge. *Id.* She must wait, however, for the EEOC to issue a notice of her right to sue before she can actually file the suit:

> If a charge filed with the Commission ... is dismissed by the Commission, or if within one hundred and eighty days from the filing of such a charge ... the Commission has not filed a civil action ... or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission ... shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge ... by the person claiming to be aggrieved....

*Id.* In dicta, the Supreme Court has indicated that this statutory provision means "only that [a] private right of action does not arise until 180 days after a charge has been filed." *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 361, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). The *Occidental* Court noted that "a natural reading of [§ 2000e–5(f)(1) ] can lead only to the conclusion that it simply provides that a complainant whose charge is not dismissed or promptly settled or litigated by the EEOC may himself bring a lawsuit, but that he must wait 180 days before doing so." *Id.*

Congress delegated to the EEOC the authority to "issue, amend, or rescind suitable procedural regulations" to carry out Title VII's provisions. Purportedly pursuant to this delegated authority, the EEOC promulgated the following regulation:

> When a person claiming to be aggrieved requests, in writing, that a notice of right to sue be issued ... the Commission may issue such notice ... at any time prior to the expiration of 180 days from the date of filing the charge with the Commission; provided that the [appropriate administrative officer] has determined that it is probable that the Commission will be unable to complete

its administrative processing of the charge within 180 days from the filing of the charge and has attached a written certificate to that effect.

29 C.F.R. § 1601.28(a)(2).

### 2. *Promulgation of Regulation*

The Court finds that the EEOC properly promulgated § 1601.28(a)(2) consistent with the rulemaking authority Congress gave it under Title VII and that therefore the regulation is valid.

Local 143 argues that § 1601.28(a)(2) is invalid because it is contrary to Title VII. Hall, of course, disagrees. The Courts of Appeals that have considered § 1601.28(a)(2) and its relation to Title VII are split. The Ninth and Eleventh Circuit courts have held that the regulation is not contrary to the statute and that therefore the regulation is valid. *Brown v. Puget Sound Elec. Apprenticeship & Training Trust*, 732 F.2d 726 (9th Cir.1984); *Sims v. Trus Joist MacMillan*, 22 F.3d 1059 (11th Cir.1994). On the other hand, the District of Columbia Circuit court disagrees and has held the regulation invalid. *Martini v. Federal Nat'l Mortgage Assoc.*, 178 F.3d 1336 (D.C.Cir.1999), *cert. denied*, 528 U.S. 1147, 120 S.Ct. 1155, 145 L.Ed.2d 1065 (2000). The Seventh Circuit Court of Appeals has not decided the issue. District courts are split, with a majority of the courts within the Seventh Circuit holding the regulation valid. *See, e.g., King v. Dunn Mem'l Hosp.*, 120 F.Supp.2d 752 (S.D.Ind.2000); *Berry v. Delta Air Lines, Inc.*, 75 F.Supp.2d 890 (N.D.Ill.1999); *contra Simler v. Harrison Co. Hosp.*, 110 F.Supp.2d 886 (S.D.Ind.2000).

To determine whether a regulation is a valid exercise of statutorily delegated authority, the Court applies the test set forth by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron*, the Supreme Court reaffirmed that when Congress's intent is clear in directly speaking to the precise question at issue, the agency must give effect to that intent and cannot promulgate contrary regulations. *Id.* at 842–43, 104 S.Ct. 2778. If Congress does not directly address the precise question at issue, leaving a silence or ambiguity about the question, and authorizes an agency to fill the gaps, the agency's answer to the question must be based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. 2778. In other words, in the face of congressional silence or ambiguity on a question, an agency's answer to the question is given controlling weight unless the answer is arbitrary, capricious or manifestly contrary to the statute. *Id.* at 844, 104 S.Ct. 2778. In determining whether congressional intent is clear, the Court should consider the specific statutory language in question as well as the language and design of the statute as a whole. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988).

### a. *Clear Congressional Intent*

The Court finds that Congress has not directly addressed the precise question of whether the EEOC may issue a right-to-sue letter earlier than 180 days after an aggrieved person filed a charge where the charge has not been dismissed on its merits. Although *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 361, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), states that a "natural reading" of Title VII does not allow private suits earlier than 180 days after a charge, that was not the issue before the Supreme Court in that case. The issue in *Occidental* was whether the EEOC retained the power to initiate a federal lawsuit after the 180–day period had passed or whether the 180–day period was intended to be a statute of limitations on EEOC enforcement actions. Any dicta relating to

the issue before the Court today is not binding and, for the reasons below, is not persuasive.

In this Court's review of the statutory text, which is the most reliable indicator of congressional intent, *Visiting Nurses Ass'n of S.W. Ind., Inc. v. Shalala,* 213 F.3d 352, 355 (7th Cir.2000), the Court finds in § 2000e–5(f)(1) no express prohibition on the early issuance of a right-to-sue letter. *See Sims v. Trus Joist MacMillan,* 22 F.3d 1059, 1062 (11th Cir.1994). Congress certainly knew how to legislate an express prohibition, *see* § 2000e–5(c) ("no charge may be filed ... before the expiration of sixty days...."), but it did not do so in § 2000e–5(f)(1). Instead, it listed two situations in which the EEOC *must* issue a right-to-sue letter without any provision that those two situations are the *only* ones in which the EEOC could issue a right-to-sue letter. *See Martini v. Federal Nat'l Mortgage Assoc.,* 178 F.3d 1336, 1342 (D.C.Cir.1999), *cert. denied,* 528 U.S. 1147, 120 S.Ct. 1155, 145 L.Ed.2d 1065 (2000). Thus, Congress did not clearly speak to the question in issue in § 2000e–5(f)(1).

Similarly, the Court cannot divine a clear congressional intent to prohibit early right-to-sue letters from the text of § 2000e–5(b). As Local 143 points out, § 2000e–5(b) states that the EEOC "shall" investigate the charge and try to eliminate unlawful practices through alternative dispute resolution methods. It does not, however, specify the duration or level of detail required of the investigations or the conciliation attempts, and it does not foreclose the possibility that those obligations could be satisfied in less than 180 days. Thus, the EEOC could conceivably perform its statutory duties *and* issue a right-to-sue letter prior to 180 days after the charge.

Even in light of the command that the EEOC "shall" make a reasonable cause determination, § 2000e–5(b), the Court finds that Congress's intent regarding early right-to-sue letters was not clear. There is no hard and fast requirement that the EEOC make its reasonable cause determination within any specific time period. In abundantly precatory language, the statute commands the EEOC to make its determination "as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge." § 2000e–5(b). Nevertheless, the statute clearly permits a right-to-sue letter and a private suit in the absence of such a determination after 180 days from the filing of the charge. § 2000e–5(f)(1). No one argues that such suits are not forbidden even though the EEOC has not made a reasonable cause determination. Congress has not specified, the Court cannot think of, and Local 143 has not provided any principled reason to distinguish that situation from one in which a right-to-sue notice was issued prior to the expiration of the 180–day period. For these reasons, the Court finds that § 2000e–5(b) does not contain a clear expression of congressional intent to prohibit early right-to-sue letters.

The Court's interpretation of the relevant provisions of Title VII is consistent with the statute's legislative history. The legislative history of the 1972 amendments to Title VII reveals that in creating the current enforcement scheme Congress sought to encourage informal conciliation and to avoid the necessity of resorting to federal lawsuits. Nevertheless, Congress recognized that aggrieved parties needed to be protected from extended administrative proceedings and bureaucratic backlog. *See Sims,* 22 F.3d at 1062–63 (citing H.R.Rep. No. 92–238 (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137). To provide such protection, Congress allowed aggrieved parties to bring private causes of action where the EEOC does not act or does not act in a timely fashion. *Id.* (quoting *Ro-*

*lark v. University of Chicago Hosp.*, 688 F.Supp. 401, 404 (N.D.Ill.1988)). The House Report accompanying the 1972 amendments to Title VII noted:

> It would ... be appropriate for the individual to institute a court action where the delay is occasioned by administrative inefficiencies. *The primary concern must be protection of the aggrieved person's option to seek a prompt remedy in the best manner available.*

1972 U.S.C.C.A.N. 2137 (emphasis added). In view of Congress's "primary concern" that an aggrieved person be able to obtain a prompt remedy in the best manner available, the Court finds it completely reasonable to construe § 2000e–5(f)(1) as permitting early right-to-sue notices where, in the EEOC's judgment, waiting 180 days would likely serve no purpose other than delay. *See Martini*, 178 F.3d at 1345. Because the Court cannot say that Congress expressed a clear intent to forbid early right-to-sue letters and the suits that inevitably follow, the Court must proceed to the second part of the *Chevron* test.

b. *Reasonable Construction of Statute*

The Court finds that the EEOC's construction of Title VII's enforcement mechanism as reflected in § 1601.28(a)(2) was not arbitrary, capricious or manifestly contrary to the statute. On the contrary, for the reasons set forth in the prior section, the Court finds that § 1601.28(a)(2) embodies a reasonable construction of the 180–day provision of § 2000e–5(f)(1) and is therefore valid. It does not contradict clear statutory mandates and is consistent with Congress's goal of providing an aggrieved party a mechanism for avoiding unnecessary delay and promptly achieving a remedy for unlawful discrimination.

▪▪▪ Furthermore, the Court finds that § 1601.28(a)(2) as applied in this case embodies a reasonable construction of the provision allowing a right-to-sue letter to be issued once the commission "dismisses"

a charge. As noted earlier, § 2000e–5(f) provides that the EEOC may issue a right-to-sue letter after "a charge filed with the Commission ... is dismissed by the Commission." The Court believes that it is reasonable for the EEOC to interpret "dismissal" of a charge to include "termination" of the charge for any reason. When interpreting statutory language, the Court should give words their ordinary and plain meaning and may consult dictionaries for assistance. *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir.2000). Dictionaries define "dismiss" to mean "terminate (an action or claim) without further hearing, esp. before the trial of the issues involved," Black's Law Dictionary 482 (7th ed.1999), or "[t]o send out of court, refuse further hearing to, reject (a claim or action)," Oxford English Dictionary (2d ed.1989). The Court believes that it was reasonable for the EEOC to conclude that it was "dismissing" a charge whenever it terminated that charge without the possibility of further action, as it did in this case, regardless of whether the termination was because the charge was not supported by reasonable cause or for administrative reasons. For this alternative reason, the Court finds that § 1601.28(a)(2) is a reasonable construction of Title VII enforcement provisions and that it is therefore a valid regulation.

E. *Conclusion*

In light of the Court's determination that § 1601.28(a)(2) is consistent with Title VII and is therefore a valid regulation, the Court finds that Hall may be able to prevail under a set of facts consistent with those alleged in her complaint. Therefore, the Court hereby **DENIES** the motion for judgment on the pleadings (Doc. 29).

## II. Motion for Partial Summary Judgment

The Court finds that genuine issues of fact remain for trial in this case and that

therefore Local 143 is not entitled to summary judgment on any count.

### A. *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Spath v. Hayes Wheels Int'l–Ind., Inc.,* 211 F.3d 392, 396 (7th Cir.2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Spath,* 211 F.3d at 396. Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane,* 969 F.2d 368, 371 (7th Cir.1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322–26, 106 S.Ct. 2548; *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir.1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir.2000). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *accord Michas,* 209 F.3d at 692.

### B. *Title VII*

■ Title VII prohibits discrimination on the basis of race: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ...." 42 U.S.C. § 2000e–2(a)(1). To establish a Title VII violation, a plaintiff may present direct proof of discrimination through direct or circumstantial evidence. *Walker v. Glickman,* 241 F.3d 884, 888 (7th Cir.2001); *Debs v. Northeastern Ill. Univ.,* 153 F.3d 390, 395 (7th Cir.1998). A plaintiff may also proceed using the burden shifting mechanism outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Because Hall has not offered any direct or circumstantial evidence of discrimination, she must proceed under the *McDonnell Douglas* approach.

Under this approach in the employment context, a plaintiff must first establish a *prima facie* case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action and (4) she was treated less favorably than others who were similarly situated. *Logan v. Caterpillar, Inc.,* 246 F.3d 912, 919 (7th Cir.2001). This approach is flexible and must be adapted to the specific factual circumstances of a particular case. *Gadsby v. Norwalk Furniture Corp.,* 71 F.3d 1324, 1334 (7th Cir.1995). In this case,

Hall needs to show that (1) she is African–American, (2) that she was available to be trained and eligible to receive her journeyperson's card, (3) that Local 143 prevented her from receiving training or obtaining her journeyperson's card and (4) other non-African-American union members were given those benefits. *See Alexander v. Local 496, Laborers' Int'l Union,* 177 F.3d 394, 403 (6th Cir.1999), *cert. denied,* 528 U.S. 1154, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000). A plaintiff's successful demonstration of each of these elements creates a rebuttable presumption of discrimination. *Id.* The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. *Id.* If the defendant is able to provide evidence of such a reason, the burden shifts back to the plaintiff to show that the articulated reason is actually a pretext for discrimination. *Id.*

Local 143 challenges Hall's ability to prove the third element of the *prima facie* case: that Local 143 prevented Hall from receiving the proper training and her journeyperson's card.[1] Local 143 argues that it was not involved with training apprentices or with issuing journeyperson's cards and that therefore it could not have discriminated against Hall in those two activities. Hall counters that Local 143 was intimately involved in those functions and therefore could have discriminated against her.

### C. *Analysis*

#### 1. *Relationship between Local 143 and Joint Apprenticeship Committee*

■ Local 143 argues that the organization responsible for training apprentices and issuing journeyperson's cards at the relevant time was the Joint Apprenticeship Committee ("JAC"), a separate legal entity from Local 143, and/or the BAT, a federal organization. In support of its argument, Local 143 submits a document entitled "Apprenticeship Standards for Plasters & Cement Masons Local #143" ("Standards," Def. Ex. 2), which is not authenticated by any affidavit but which both parties agree was approved by the JAC in 1992 and by the BAT in 1993. Local 143 posits without any evidentiary support that because the Standards existed, they were followed. Local 143 also offers a tax return of Local 143 Joint Apprenticeship Trust, which is not authenticated by any affidavit. However, Local 143 fails to explain the relationship, if any, between the JAC and the Local 143 Joint Apprenticeship Trust. The one piece of probative evidence offered by Local 143 (but not attached to its brief or motion) is the deposition of Ron Eades ("Eades") in which Eades testifies that the JAC and Local 143 have separate offices.

In her response to the motion, Hall presents evidence that Local 143 and the JAC are not as separate as Local 143 would have the Court believe. Hall notes that, according to the Standards, the JAC was supposed to be comprised of four people—two representatives of Local 143 and two employer representatives. In reality, Hall contends, Eades, who was the business manager and financial secretary of Local 143, was also the chairman of a two-person, inactive JAC and unilaterally made decisions for the JAC. In support of this contention, Hall points to two letters relating to JAC business that Eades sent on Local 143 letterhead, one requesting that the BAT remove Hall from the apprentice program and one informing Hall that she had been removed from the program. Eades sent the letter to the BAT on behalf of "Plasterers & Cement Masons Joint

---

1. Local 143 admits that the question of whether it discriminated against Hall based on its alleged refusal to refer her for work must be tried.

Apprenticeship Training Program" but signed as "Business Manager & Financial Secretary," the positions he held with Local 143 (Pl.Ex. B). She also cites Eades's deposition testimony that the JAC did everything "out of the local," that the JAC was not active, and that he personally rather than with the entire committee, which was just being formed at the time, made the decision to terminate Hall from the program.

### 2. *Journeyperson's Cards*

Local 143 also argues that the JAC, not Local 143, was responsible for issuing certificates of completion of an apprenticeship program, which was required before an apprentice could become a journeyperson. In support of this argument, Local 143 "quotes"[2] a provision from the OPCMIA constitution dated 1989 to 1994 stating that apprentices who complete their apprenticeship and training and who receive a certificate of completion from the JAC shall be entered in the local's rolls as a journeyperson. One page later in its brief, Local 143 argues that it was not the JAC but the BAT that issued the certificate of completion. In support of this inconsistent position, Local 143 cites the Standards, which provide that after an apprentice has completed her apprenticeship, the JAC shall recommend to the BAT that she be issued a certificate of completion. Local 143 also offers a March 25, 1998, letter from Eades to the BAT requesting a certificate of completion for Hall (Def.Ex. 4). The letter is on Local 143 letterhead and is signed by Eades in his capacity as business manager for Local 143. The BAT responded that it would not issue a certificate of completion to Hall because she had not met the requirements of Local 143's standards of apprenticeship (Def.Ex. 5).

In response, Hall offers a copy of her application to become a journeyperson (Pl. Ex. D). At the bottom of the application, two Local 143 officers (Eades was one of them) certified that she had successfully completed her term of apprenticeship and was qualified to enroll as a journeyperson. Hall contends that, for the reasons discussed in the previous section, the certificate from Local 143 is equivalent to a certificate from JAC and that it satisfies the OPCMIA constitutional requirement that the JAC issue the certificate. Hall also offers Eades's deposition testimony that casts doubt on whether the Standards, and thus the requirement that the BAT as opposed to the JAC issue a certificate of completion, applied at the time Hall applied for her journeyperson's card.

### 3. *Training*

Local 143 maintains that it had no involvement in Hall's apprenticeship training. In support of this position, Local 143 points to the Standards, which provide essentially that the JAC was responsible for ensuring that apprentices receive the proper instruction, training and experience. Hall contends, as admitted by Eades, that the JAC was inactive at the time and never discussed or took responsibility for Hall's apprenticeship. She argues that in fact Local 143 handled apprentice training and points to Eades's statement that Local 143's executive board discussed Hall's apprenticeship. She submits, without authentication, what appear to be December 11, 1995, executive board minutes reflecting that the executive board was going to review Hall's record to decide whether to upgrade her to journeyperson. (Pl.Ex. F).

---

**2.** The quotation that appears in Local 143's brief vaguely resembles the actual language of the constitution.

The Court finds that Hall has presented sufficient evidence to create a genuine issue of material fact for trial. The Court believes that based on the evidence summarized above, viewed in the light most favorable to Hall, a reasonable jury could find that at the relevant time Local 143 was the same as the JAC for all practical purposes or had at least assumed its duties and responsibilities, including but not limited to the duty to ensure that apprentices received the proper instruction, training and experience. It appears that in certain situations, such as the two letters regarding Hall's termination from the program and the March 25, 1998, letter to the BAT, Local 143 and the JAC failed to maintain separate and distinct identities. It also appears that Eades, who was an officer of both entities, made unilateral decisions without implementing the proper JAC governing procedures and that a reasonable jury could find that he was acting in his capacity as an officer of Local 143. A reasonable jury could also find that the appropriate procedure for getting a journeyperson's card was outlined in the OPCMIA constitution and not in the Standards. Applying the OPCMIA constitution's standards, a reasonable jury could find that a certificate of completion from Local 143 satisfied the requirement that an apprentice obtain a certificate from the JAC and that Local 143 was then obligated to enter her on its membership roles as a journeyperson.

For these reasons, the Court believes that a fair-minded jury could return a verdict for Hall on the evidence presented and that therefore material issues exist for trial. Because Hall has demonstrated that genuine issues of material fact exist, the Court hereby **DENIES** Local 143's motion for partial summary judgment (Doc. 29).

### III. Conclusion

For the foregoing reasons, the Court hereby **ORDERS** that Local 143 shall have up to and including September 28, 2001, to amend its answer to include the affirmative defense of exhaustion of administrative remedies. The Court further **DENIES** Local 143's motion for judgment on the pleadings and motion for partial summary judgment (Doc. 29).

**IT IS SO ORDERED.**