In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3076, 99-3336, 99-3891, 99-3892,
and 01-2050

National Organization for Women, Inc., on
behalf of itself and its women members
and all other women who use or may use
the services of women's health centers
that provide abortions, and Delaware
Women's Health Organization, Inc., and Summit
Women's Health Organization, Inc., on
behalf of themselves and the
class of all women's health centers in
the United States at which abortions are
performed,

Plaintiffs-Appellees,

v.

Joseph M. Scheidler, Pro-Life Action League,
Inc., Andrew D. Scholberg, Timothy Murphy, and
Operation Rescue,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 86 C 7888--David H. Coar, Judge.

Argued September 14, 2000--Decided October 2, 2001


  Before Rovner, Diane P. Wood, and Evans,
Circuit Judges.

  Diane P. Wood, Circuit Judge.  This case
is in its fifteenth year of contentious
litigation. The defendants are anti-
abortion activists who employ a protest
tactic they call "rescues," in which they
and other activists physically block
access to abortion clinics so that the
patients and staff cannot get in or out
of the buildings. Plaintiffs use words
less benign than "rescue" to describe the
defendants' activities. We will refer to
them as "protest missions," in the hopes
that this will be understood as a neutral
term. The defendants' goal is frankly to
prevent abortions from taking place.
Participants in the protest missions
engage in a substantial amount of
protected speech, including efforts to
persuade clinic patients not to have
abortions and to persuade clinic doctors

and staff to quit performing abortions. Unfortunately, the protest missions also involve illegal conduct: protesters do everything from sitting or lying in clinic doorways and waiting to be arrested to engaging in more egregious conduct such as entering the clinics and destroying medical equipment and chaining their bodies to operating tables to prevent the tables from being used. In a few instances, protesters apparently have physically assaulted clinic staff and patients. In addition to staging these protests, the defendants have issued letters and statements to other clinics threatening to stage missions at those clinics unless they voluntarily shut down.

The plaintiffs, the National Organization for Women (NOW) and two clinics that were the targets of protest missions, brought this class action alleging, among other things, that the defendants' conduct amounted to a pattern of extortion which violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. sec.sec. 1961-68 (RICO). The trial judge certified two classes: one, represented by NOW, of all NOW members and non-members who have used or would use the services of an abortion clinic in the United States, and a second of all such clinics. After a trip through this court to the Supreme Court of the United States during which many of the legal issues in the case were clarified or resolved, the case was remanded to the district court for trial of the plaintiffs' RICO claims. A jury found for the plaintiffs and awarded damages to the two named clinics, and the district court issued a permanent nationwide injunction prohibiting the defendants from conducting blockades, trespassing, damaging property, or committing acts of violence at the class clinics. The defendants have appealed a wide range of issues relating to the conduct of the trial and the issuance of the injunction. We find that the district court navigated its way through this complex and difficult case with care and sensitivity and affirm its judgment in all respects.

I

Many of the facts pertinent to this opinion are set out in the Supreme Court's decision remanding the case,

National Organization for Women, Inc. v. Scheidler, 510 U.S. 249 (1994) (NOW I), and in our earlier decision in the case, National Organization for Women, Inc. v. Scheidler, 968 F.2d 612 (7th Cir. 1992), and we will not recount them in detail here. Nonetheless, in order to put the defendants' appeal in context, a brief overview of the facts presented at trial and of the procedural history of the case may be helpful.

The individual defendants, Joseph Scheidler, Andrew Scholberg, and Timothy Murphy are on the Board of Directors of one of the corporate defendants, the Pro-Life Action League (PLAL). The other corporate defendant is Operation Rescue. (Randall Terry, the director of Operation Rescue, was also originally a defendant in the case, but he has since settled with the plaintiffs). All of the defendants were among the organizers of the Pro-Life Action Network (PLAN), which is a loose national organization of groups that engage in protest missions and other aggressive anti-abortion tactics. Beginning in the mid-1980's, PLAN held annual conventions, organized in part by the defendants here, which included seminars on protest strategies. Those conventions concluded with protest missions being staged in the convention city. PLAN also sent a newsletter to its members and coordinated a hotline that potential protesters could call to get information about upcoming missions. The plaintiffs alleged, and at trial the jury found, that PLAN was an "organization or enterprise" for purposes of RICO liability.

Initially, the plaintiffs alleged that the defendants' tactics violated both RICO and federal antitrust law. In 1992, however, this court issued an opinion dismissing both theories of liability, reasoning that the antitrust laws were not applicable because the plaintiffs had not alleged that the defendants exercised any form of market control over the supply of abortion services and that RICO did not reach the defendants' conduct because the plaintiffs had not shown that the alleged racketeering acts were "economically motivated." 968 F.2d at 617-30. The Supreme Court granted certiorari on the limited question whether RICO requires proof that either the racketeering enterprise or the

alleged predicate acts were motivated by an economic purpose. (The antitrust holding of our 1992 decision was thus left undisturbed.) The Court concluded that RICO contains no such economic motive requirement and therefore reversed our decision on that point. 510 U.S. at 256-62. Thereafter, we remanded the case to the district court for trial of the plaintiffs' RICO claims.

During the course of the seven-week trial, the plaintiffs introduced evidence of hundreds of acts committed by the defendants or others acting in concert with PLAN which, the plaintiffs contended, constituted predicate acts under RICO. The alleged predicate acts included violations of federal extortion law (the Hobbs Act, 18 U.S.C. sec. 1951), state extortion law, the federal Travel Act, 18 U.S.C. sec. 1952, and conspiracy to violate these laws. A few of the more egregious acts the plaintiffs alleged included:

At a protest mission in Chico, California, protesters pressed four clinic staff members up against a glass entranceway to the clinic for several hours and refused to let them go even when they complained they were being crushed. The glass wall eventually either loosened or shattered, injuring a clinic staffer.

At a similar mission in Los Angeles, protesters grabbed at a patient's arms and legs and tried to restrain her physically from entering the clinic. The patient was actually at the clinic for a follow-up to ovarian surgery, and the attack by the protesters reopened her incisions. As a result of the attack, the patient had to be rushed to the hospital.

In several instances, protesters entered clinics and destroyed medical equipment.

In several cases, protesters not only blocked doorways with their bodies, but chained themselves to the doorways of clinics, or, in some cases, to operating tables inside clinics.

In December 1985, defendant Scheidler sent letters to every abortion provider in the Chicago area calling for a "Christmas Truce." In these letters, he requested that the clinics shut down for

a specific day in December, stated that he would "call to confirm" the clinic's decision, and warned that non-complying clinics would be subjected to "non-violent direct action," a catch-phrase PLAN and PLAL frequently used for their activities.

Based on this and other evidence in the voluminous record that was created at the trial, the jury found in response to special interrogatories that the defendants or others associated with PLAN committed 21 violations of the Hobbs Act, 25 violations of state extortion law, 25 acts of conspiracy to violate federal or state extortion law, four acts or threats of physical violence, 23 violations of the Travel Act, and 23 attempts to commit one of these crimes. The jury awarded damages to both clinics; once the damages were trebled, as RICO requires, the awards totaled over $163,000 to Summit Women's Health Organization and over $94,000 to Delaware Women's Health Organization.

After the jury returned its verdict, the district court held three days of additional hearings and then entered a permanent, nationwide injunction prohibiting the defendants or those acting in concert with them from interfering with the rights of the class clinics to provide abortion services, or with rights of the class women to receive those services, by obstructing access to the clinics, trespassing on clinic property, damaging or destroying clinic property, or using violence or threats of violence against the clinics, their employees and volunteers, or their patients.

II

Initially, we must consider the defendants' contention that RICO does not permit private plaintiffs to seek injunctive relief. The only court of appeals to have addressed this issue directly, the Ninth Circuit, concluded in 1986 that private plaintiffs cannot seek injunctions under RICO, relying largely on the court's reading of the statute's legislative history. See Religious Tech. Ctr. v. Wollersheim, 796 F.2d 1076 (9th Cir. 1986). The other courts of appeals that have addressed the point in dicta are split. Compare Johnson v. Collins

Ent'mt. Co., 199 F.3d 710, 726 (4th Cir. 1999), In re Fredeman Litig., 843 F.2d 821, 828-30 (5th Cir. 1988), and Trane Co. v. O'Connor Sec., 718 F.2d 26, 28-29 (2d Cir. 1983) (expressing doubt about availability of injunctive relief for private plaintiffs), with Bennett v. Berg, 710 F.2d 1361, 1366 (8th Cir. 1983) (McMillan, J., concurring) (suggesting injunctive relief is available); see also Lincoln House, Inc. v. Dupre, 903 F.2d 845, 848 (1st Cir. 1990), Northeast Women's Ctr. v. McMonagle, 868 F.2d 1342, 1355 (3d Cir. 1989) (noting controversy but expressing no opinion on resolution). Our study of Supreme Court decisions since the 1986 Wollersheim opinion convinces us that the approach of the Ninth Circuit (which relied almost exclusively on the legislative history of RICO to reach its result, as opposed to the actual language of the statute) no longer conforms to the Court's present jurisprudence, assuming for the sake of argument that it was a permissible one at the time. We are persuaded instead that the text of the RICO statute, understood in the proper light, itself authorizes private parties to seek injunctive relief.

In interpreting the remedial provisions of the RICO statute, our inquiry begins with the statute's text, and, if the text is unambiguous, it ends there as well. See Alexander v. Sandoval, 121 S. Ct. 1511, 1520-21 & n.7 (2001); NOW I, 510 U.S. at 261. RICO's civil remedies section provides, in pertinent part:

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to . . . imposing reasonable restrictions on the future activities . . . of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, . . . or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

(b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such

other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. . . .

18 U.S.C. sec. 1964.

Both parties have offered interpretations of this text that support their positions. The plaintiffs read the statute in a straightforward manner. Section 1964(a), they contend, grants the district courts jurisdiction to hear RICO claims and also sets out general remedies, including injunctive relief, that all plaintiffs authorized to bring suit may seek. Section 1964(b) makes it clear that the statute is to be publicly enforced by the Attorney General and it specifies additional remedies, all in the nature of interim relief, that the government may seek. Section 1964(c) similarly adds to the scope of sec. 1964(a), but this time for private plaintiffs. Those private plaintiffs who have been injured in their business or property by reason of a RICO violation are given a right to sue for treble damages. As the plaintiffs note, this reading of the statute gives the words their natural meaning and gives effect to every provision in the statute.

The defendants argue for a less intuitive interpretation. Relying on Wollersheim, they argue that sec. 1964(a) is purely a jurisdictional provision authorizing the district court to hear RICO claims and to grant injunctions to parties authorized by other provisions of the law to seek that form of relief. Section 1964(b), in the defendants' view, allows the Attorney General to institute RICO proceedings and authorizes the government to seek not only the relief described in that subsection, but also the relief described in sec. 1964(a). Section 1964(c) then provides a limited right of action for private parties. They read the two clauses of sec. 1964(c), however, as tightly linked provisions, under which private plaintiffs may sue

only for monetary damages. The mention of this type of relief in the second clause must mean, the defendants argue, that by implication no other remedies, particularly injunctive remedies, are available. We cannot agree that this is a reasonable reading of the statute.

As an initial matter, we note that the Wollersheim decision apparently misreads sec. 1964(b) when it states that sec. 1964(b) explicitly "permits the government to bring actions for equitable relief." Wollersheim, 796 F.2d at 1082. Section 1964(b) does allow the government to seek equitable relief, but it specifically mentions only interim remedies. Although no one doubts that permanent injunctions are also available to the government, the government's ability to seek permanent, as opposed to interim, equitable remedies comes from the general grant of authority for district courts to enter injunctions found in sec. 1964(a), not from anything in sec. 1964(b). (The sentence "[t]he Attorney General may institute proceedings under this section" is in that respect the equivalent of the first clause in sec. 1964(c), which says "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ." Neither one addresses what remedy the plaintiff may seek.) Given that the government's authority to seek injunctions comes from the combination of the grant of a right of action to the Attorney General in sec. 1964(b) and the grant of district court authority to enter injunctions in sec. 1964(a), we see no reason not to conclude, by parity of reasoning, that private parties can also seek injunctions under the combination of grants in sec.sec. 1964(a) and (c).

In addition, we cannot agree with the defendants' contention that sec. 1964(a) is a purely "jurisdictional" statute, despite the Ninth Circuit's characterization of it in that way in Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1307 (9th Cir. 1992) (construing Wollersheim holding as jurisdictional). What sec. 1964(a) does is to grant district courts authority to hear RICO claims and then to spell out a non-exclusive list of the remedies

district courts are empowered to provide in such cases. In that sense, sec. 1964(a) is strikingly similar to the statute the Supreme Court construed in Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 90 (1998). The statute at issue in Steel Co. provided that "[t]he district court shall have jurisdiction in actions brought under subsection (a) of this section against an owner or operator of a facility to enforce the requirement concerned and to impose any civil penalty provided for violation of that requirement." Id., quoting 42 U.S.C. sec. 11046(c). Noting that "'[j]urisdiction' . . . is a word of many, too many, meanings," the Court held that it would be "unreasonable to read [the statute] as making all the elements of the cause of action under subsection (a) jurisdictional, rather than as merely specifying the remedial powers of the court, viz., to enforce the violated requirement and to impose civil penalties." Id. This part of the Steel Co. holding supersedes any rationale to the contrary that the courts of appeals may have followed in earlier years. We find that it is applicable to RICO and that sec. 1964(a) both confers jurisdiction on the district courts and specifies certain remedial powers that the courts will have in cases brought before them.

Once we accept that sec. 1964(a) is not purely jurisdictional, but also describes remedies available under RICO, the defendants' position becomes untenable. In the defendants' view, despite the general provisions for equitable relief in sec. 1964(a), injunctive relief is not available to any particular plaintiff unless it is also provided by some other section of the statute. This reading renders sec. 1964(a)'s provision for injunctive relief a nullity. Because an alternative reading exists which gives meaning to every section of the statute, see Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992) ("courts should disfavor interpretations of statutes that render language superfluous"), we reject the defendants' approach.

The defendants' final textual argument springs from the maxim that "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." Transamerica

Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 19 (1979). While we have no doubt that this is good advice as a general matter, we do not find it particularly helpful in this case. This is not a situation in which Congress has provided for a private damages remedy and has remained silent as to the availability of injunctive relief. Instead, Congress explicitly provided for injunctive relief in sec. 1964(a), although it did not specify in that section which plaintiffs can seek such relief. Given that the next two sections describe two types of plaintiffs, the government and private plaintiffs, and spell out additional remedies specific to each type, we find that the only logical conclusion is that Congress intended the general remedies explicitly granted in sec. 1964(a) to be available to all plaintiffs.

  Although we would be confident resting our holding purely on the plain text of sec. 1964, we note that our interpretation is consistent with Congress's admonition that the RICO statute is to be "liberally construed to effectuate its remedial purposes." Pub. L. No. 91-452, sec. 904(a), 84 Stat. 947 (1970). Adhering to this admonition, which "obviously seeks to ensure that Congress' intent is not frustrated by an overly narrow reading of the statute," Reves v. Ernst & Young, 507 U.S. 170, 183 (1993), the Supreme Court has consistently rejected interpretations by the courts of appeals that would limit the scope of RICO actions in ways not contemplated by the text of the statute. See, e.g., Cedric Kushner Promotions, Ltd. v. King, 121 S. Ct. 2087 (2001) (rejecting argument that employee of corporation acting within scope of employment cannot be a "person" distinct from the corporation); Salinas v. United States, 522 U.S. 52, 61-66 (1997) (rejecting requirement that conspiracy defendant himself has committed predicate acts); NOW I, 510 U.S. at 256-62 (rejecting requirement that enterprise have an economic motive); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985) (rejecting requirements that defendant has been convicted of predicate act and that plaintiff suffer a "racketeering injury," as opposed to injury from mere predicate acts); United States v. Turkette, 452 U.S. 576 (1981)

(rejecting argument that RICO enterprise must have legitimate as well as illegitimate aspects). RICO's liberal-construction clause has particular force, as the Supreme Court has stated, when we are construing sec. 1964, the civil remedy provision, because it is in this section that "RICO's remedial purposes are most evident." Sedima, 473 U.S. at 491 n.10. In keeping with the spirit of these cases, we decline to restrict the remedies available under RICO, when Congress has provided for broad equitable relief under sec. 1964(a).

Our interpretation of sec. 1964 is also in keeping with the underlying purposes of the RICO statute. As the Supreme Court recently noted, Congress in enacting RICO intended to "encourag[e] civil litigation to supplement Government efforts to deter and penalize the . . . prohibited practices. The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." Rotella v. Wood, 528 U.S. 549, 557 (2000). Recognizing that the statute gives private citizens the ability to seek injunctive relief as well as damages is fully consistent with this role for civil RICO litigation.

Perhaps realizing that the plain text of the statute strongly suggests that private plaintiffs can seek injunctions, the Wollersheim court relied heavily in its decision on two pieces of legislative history. First, the court noted that,during the floor debate on the bill in the House, Representative Steiger, the House sponsor of the bill, introduced an amendment that would have, among other things, made private plaintiffs' right to seek injunctive relief explicit. The amendment was withdrawn after another representative described it on the House floor as creating "an additional civil remedy." See Wollersheim, 796 F.2d at 1085-86. Second, the court noted that one year after the bill's passage, Congress failed to pass a bill introduced in the Senate with the same language as the Steiger amendment. See id. at 1086. From these two occurrences, the Ninth Circuit concluded that "in considering civil RICO, Congress was repeatedly presented with the opportunity expressly to include a provision permitting private plaintiffs

to secure injunctive relief. On each occasion, Congress rejected the addition of any such provision." Id.

Again, with respect, we cannot agree with the Ninth Circuit that these snippets of legislative history amount to the kind of "'clearly expressed legislative intent to the contrary'" that we would require to cast doubt on unambiguous statutory language. NOW I, 510 U.S. at 261. Even these excerpts do not unequivocally indicate that Congress intended private plaintiffs to be limited to damages remedies. As the Wollersheim decision itself notes, there are indications in the legislative history to the contrary. Id. at 1085. More importantly, however, although the Wollersheim court may well have made a reasonable decision in 1986 to rely on Congress's refusal to enact amendments to the statute, recent Supreme Court precedent teaches that this type of legislative history is a particularly thin reed on which to rest the interpretation of a statute. See, e.g., Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs, 531 U.S. 159, 169-70 (2001) ("Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute. A bill can be proposed for any number of reasons, and it can be rejected for just as many others."); Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 187 (1994) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change."). Given the Court's reluctance in recent years to rely on the type of legislative history that underpins Wollersheim, we cannot agree with the Ninth Circuit's earlier view that this legislative history trumps the otherwise plain language of sec. 1964.

In a last effort to save their reading of the statute, the defendants urge us that certain differences between thelanguage of RICO and the language of section 4 of the Clayton Act (on which RICO was based) demand the inference that no private right to injunctive relief exists under RICO. The Clayton Act, they

note, provides private rights of action in two separate sections: one for damages in sec. 4, 15 U.S.C. sec. 15(a), and one for injunctive relief in sec. 16, 15 U.S.C. sec. 26. RICO, in contrast, has only one statutory section addressing civil remedies, and the only subsection that specifically talks about private actions mentions only damages. Defendants argue that Congress's failure to include in sec. 1964(c) language analogous to that in Clayton Act sec. 16 must mean that it did not intend to allow private parties to seek injunctions.

We reject this line of analysis for a number of reasons. First, the mere fact that the Clayton Act spreads its remedial provisions over a number of different sections of the U.S. Code,/1 and RICO does not, adds little to our understanding of either statute. More importantly, the Supreme Court regularly treats the remedial sections of RICO and the Clayton Act identically, regardless of superficial differences in language. See, e.g., Klehr v. A.O. Smith Corp., 521 U.S. 179, 188-89 (1997) (applying Clayton Act rule for accrual of cause of action to RICO); Holmes v. SIPC, 503 U.S. 258, 267 (1992) (applying proximate cause rule to RICO). Since the Court has already determined that litigants other than the Attorney General may obtain broad injunctive relief under the Clayton Act, see California v. American Stores Co., 495 U.S. 271 (1990), cases like Klehr and Holmes indicate that we ought to adopt the same interpretation with respect to RICO. Indeed, American Stores (which came to the Court from the Ninth Circuit) pointedly rejected the way in which the Ninth Circuit had relied on legislative history to limit the Clayton Act's textual grant of private injunctive relief. Id at 285. This in turn undercut Wollersheim, which had used the same methodology as the discredited American Stores opinion. For all these reasons, we find that sec. 1964 authorizes injunctive relief at the behest of both the Attorney General and private plaintiffs, authorizes interim measures when the Attorney General sues, and authorizes private treble damages only for private plaintiffs (and not the United States). The district court thus correctly concluded that RICO authorized the private plaintiffs here to seek injunctive relief.

III

   With this much established, we may turn to the defendants' First Amendment arguments. All parties acknowledge that the defendants engaged in a substantial amount of protected speech during the protest missions and other anti-abortion activities, including picketing on public sidewalks in front of clinics and verbally urging patients not to have abortions. We entirely agree with the defendants that liability cannot constitutionally be imposed on them for this portion of their conduct. But the record is replete with evidence of instances in which their conduct crossed the line from protected speech into illegal acts, including acts of violence, and it is equally clear that the First Amendment does not protect such acts. As is true in many political protest cases, the defendants' protected speech was often closely intertwined with their unprotected illegal conduct. Nevertheless, we believe the district court adequately ensured that the jury's verdict was not based on activities protected by the First Amendment, and that the remedies it ordered also respected the line between protected expression and unprotected conduct.

   The defendants' First Amendment arguments fall into two categories. First, they argue broadly that imposing liability on them on the basis of their protest activities violates the First Amendment. Second, they argue that, even assuming they could constitutionally be held liable for their alleged conduct, the jury instructions and verdict form in this case did not contain necessary First Amendment safeguards. Before we reach either of these arguments, we pause to consider the standard of review we should apply in analyzing the defendants' First Amendment claims.

   The Supreme Court has repeatedly held that, in cases in which First Amendment concerns are implicated, reviewing courts have an obligation to conduct an "'independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984),

quoting New York Times Co. v. Sullivan, 376 U.S. 254, 284-86 (1964). Although this maxim has been applied most often in cases reviewing the factual findings of lower courts, the Court in Bose noted that the rule is equally applicable "whether the factfinding function be performed in the particular case by a jury or by a trial judge." 466 U.S. at 501. Citing this rule, the defendants urge that our review of their First Amendment challenges must be plenary.

As we have noted before, however, even though Bose calls for an "independent examination of the whole record," it is not entirely clear what this "plenary" review is supposed to entail. See Brown & Williamson Tobacco Corp. v. Jacobson, 827 F.2d 1119, 1128-29 (7th Cir. 1987). In particular, it is not clear whether Bose requires an independent review only of the ultimate factual conclusion that the defendants' conduct fell outside the protection of the First Amendment, or whether this court is required to conduct a more searching review of "findings of underlying facts, evaluations of credibility, and the drawing of inferences." Brown & Williamson, 827 F.2d at 1128. In cases in which we are reviewing a jury verdict rather than the findings of a lower court, the question is even more complex, because we must somehow reconcile the defendants' First Amendment rights against the command of the Seventh Amendment that "no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. Bose itself involved review of facts found by the district court under Fed. R. Civ. P. 52(a), and thus the Court had no occasion to consider this problem. For a different reason, we conclude that it is not necessary here to decide whether or not a broader version of the re-examination of jury findings is permissible when First Amendment rights are at issue. Even assuming that the Bose dicta requires us to conduct a plenary review of all of the factual findings relevant to the First Amendment issues before us (which is the most favorable position we can take for the defendants), we find that the jury's determinations are fully supported by the record.

A.

Protection of politically controversial speech is at the core of the First Amendment, and no one disputes that the defendants' speech labeling abortion as murder, urging the clinics to get out of the abortion business, and urging clinic patients not to seek abortions is fully protected by the First Amendment. See, e.g., Bray v. Alexandria Women's Health Clinic, 506 U.S. 263 (1993). It is equally clear, however, that the First Amendment does not protect violent conduct, Wisconsin v. Mitchell, 508 U.S. 476, 484 (1993), nor does it protect threats, Madsen v. Women's Health Ctr., 512 U.S. 753, 773 (1994), or language used to carry out illegal conduct, Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949). Even when a defendant's conduct involves expressive elements, the government is free to regulate the non-expressive aspects of the conduct if such regulation is necessary to serve important government interests. United States v. O'Brien, 391 U.S. 367, 377 (1968). The protection of the plaintiffs' rights to seek and provide medical care free from violence, intimidation, and harassment is such an important government interest. See, e.g., Hill v. Colorado, 530 U.S. 703, 715 (2000); Schenck v. Pro-Choice Network of W. New York, 519 U.S. 357, 376 (1997); Madsen, supra, 512 U.S. at 768. As the Supreme Court has explained, "violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection." Roberts v. United States Jaycees, 468 U.S. 609, 628 (1984).

In this case, the plaintiffs presented ample evidence that the individual defendants and others associated with PLAN engaged in illegal conduct that directly threatened an important governmental interest. The evidence presented at trial showed that, at PLAN-sponsored events, protesters trespassed on clinic property and blocked access to clinics with their bodies, including at times chaining themselves in the doorways of clinics or to operating tables. At other times, protesters destroyed clinic property, including putting glue in clinic door locks and destroying medical equipment used to perform abortions. On still other occasions, protesters

physically assaulted clinic staff and patients. In addition, defendant Scheidler, on behalf of defendants PLAL and PLAN, sent letters to class clinics threatening that they would be subjected to similar attacks if they did not cease performing abortions. In light of the protesters' conduct at other PLAN events, the district court correctly concluded that these letters were not protected political speech but constituted true threats outside the protection of the First Amendment.

Assuming that the defendants can be held liable for these incidents, all of which occurred under PLAN sponsorship, then the plaintiffs produced ample evidence of illegal conduct that may legitimately be regulated given the importance of the governmental interest in protecting the right to seek and provide medical care. In a case where a similarly important governmental interest is not present and the conduct in question has an expressive element, we do not disagree with the defendants that the First Amendment might well shield that particular conduct from being used as the basis for RICO liability. (We express this thought cautiously only because the balance between the strength of the government's interest and the degree to which conduct has an expressive element will vary from case to case.) In any event, this case presents no such problems. We are satisfied that the record here easily supports the jury's finding of liability.

At this point, the defendants shift their argument to a more personal one: maybe someone associated with PLAN was engaged in unprotected conduct, but the evidence did not establish that the defendants themselves were involved, as opposed to being involved exclusively in PLAN's protected speech activities. In NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982), the Supreme Court noted that, where an organization engages in both protected speech and unprotected, illegal conduct, the First Amendment does not permit individuals to be held liable for the organization's illegal acts merely based on their association with the organization. Id. at 908-09. Rather, in order to impose liability on an individual based on that individual's association with an organization, a plaintiff must show both that the

organization itself, rather than just isolated members, possessed unlawful goals and that the individual defendant held a specific intent to further those illegal aims. Id. at 920.

We agree that Claiborne Hardware is directly applicable to our case. Although the plaintiffs established that the individual defendants themselves participated in many of the incidents described during the trial, the plaintiffs also introduced evidence of many other incidents coordinated or orchestrated by PLAN for which they did not specifically show that the individual defendants themselves committed the illegal acts described. In order for the defendants to be held responsible for acts committed by other members of PLAN during PLAN-organized events, Claiborne Hardware required the plaintiffs to show that PLAN itself, and not merely isolated members, intended that the illegal acts occur, that the defendants were aware of PLAN's illegal aims, and that the defendants held a specific intent to fur ther those aims through their association with PLAN.

Even though this is an exacting test, once again the record shows that the plaintiffs satisfied it in this case. All of the individual defendants who remain in the case were on the board of directors of PLAL. PLAL and Operation Rescue, the two remaining organizational defendants, were in turn the primary organizers of PLAN. The plaintiffs put into evidence numerous letters, newsletters, and other publications authored by defendant Joseph Scheidler, executive director of PLAL, and by Randall Terry, executive director of Operation Rescue, detailing the activities planned for upcoming PLAN events. The activities detailed in these letters included blocking access to clinics and entering clinics to block passageways. As noted above, these types of protest activities are illegal conduct unprotected by the First Amendment. Similarly, the threatening letters to plaintiff clinics were sent on PLAL letterhead, signed by Scheidler, and specifically described the threat as coming from PLAN. The jury was entitled to conclude from this evidence that PLAN itself, not merely isolated members, held illegal aims.

It is also significant that all of the individual defendants were high-level leaders within PLAN, and as such they knew of PLAN's illegal aims and intended to further those aims. The record showed that defendant Scheidler personally organized and coordinated many of PLAN's activities. Defendants Scholberg and Murphy also participated in planning meetings for PLAN events at which illegal blockades were to take place and spoke at PLAN conventions designed to train protesters in the use of these tactics. The plaintiffs presented more than enough evidence to convince us that the individual defendants actively intended to further PLAN's illegal goals.

B.

Turning to the defendants' narrower First Amendment argument, the defendants contend that, regardless of whether there was sufficient evidence from which the jury could have found that they engaged in unprotected activities, the jury instructions and verdict form used by the trial court allowed the jury to find the defendants liable based solely on the defendants' protected speech. The verdict form that the district court used asked the following relevant questions:

1. Is the Pro-Life Action Network (PLAN) a group of people or organizations associated together for a common purpose?

2. Were the . . . defendants associated with PLAN? (See Jury Instruction No. 20 for the definition of "associated with.")
. . .

4. Did any Defendant, or any other person associated with PLAN, commit any of the [alleged predicate acts]?

The jury instruction to which the verdict form referred stated, in relevant part:

Jury Instruction No. 20: Plaintiffs must show that the defendant was "associated with" PLAN. That is, the defendant must have had some minimal association with PLAN and have known something about PLAN's activities as they relate to the illegal acts under RICO. It is not necessary that the particular defendant committed acts unlawful under RICO or was aware of all of the unlawful acts committed by the other people who were

associated with PLAN. . . . .

In the district court, the defendants objected to these instructions, arguing that they did not require the jury to find that the defendants harbored a specific intent to further PLAN's illegal aims, as required by Claiborne Hardware. The district court apparently agreed, because it added an additional jury instruction which stated:

Jury Instruction No. 30--Defendants' Liability for Acts of Others

Liability may not be imposed upon any defendant merely because that defendant belonged to a group, some members of which committed acts of violence. In order to find the defendants liable, you must conclude that the enterprise, or those acting on behalf of the enterprise, directly or indirectly authorized or ratified unlawful activities and that the defendants held a specific intent to further those illegal objectives.

The defendants did not renew their objection to the jury instructions after the district court made this change. Nevertheless, in this court, the defendants have argued that, even with the additional instruction, the jury instructions did not adequately protect their First Amendment rights, because the Claiborne Hardware standard was incorporated only into the jury instructions, not into the verdict form.

Initially, we note that by not renewing their objection to the jury instructions and verdict form after the district court added Instruction 30, the defendants at least implied that they were satisfied with the court's resolution of their objection. Accordingly, we are inclined to find that the defendants have waived any objection to those instructions on appeal. See United States v. Jones, 224 F.3d 621, 626 (7th Cir. 2000) (objection to jury instruction waived where defense counsel agreed to instruction at trial). Because this is a civil trial, not a criminal trial, there is no equivalent of "plain error" review for a challenge that is forfeited rather than waived. In the interest of absolute fairness, however, we will consider this point based on the earlier objections.

Our review of jury instructions is deferential, and we consider only whether the instructions, taken as a whole, adequately informed the jury of the applicable law. Molnar v. Booth, 229 F.3d 593, 602 (7th Cir. 2000). We are confident that these instructions did so. This jury could not have found the defendants liable without finding that the defendants themselves specifically intended to further PLAN's illegal aims. Jury Instruction 30 made this requirement explicit, and absent any indication to the contrary, we presume that jurors follow the instructions they are given. Miksis v. Howard, 106 F.3d 754, 763 (7th Cir. 1997). There is no requirement for a district judge to replicate every instruction on the verdict form itself. We are confident that the jurors followed their instructions, heeded Instruction 30 when they considered the questions on the special verdict form, and that nothing on the form misled or confused them or caused them to ignore their instructions.

IV

The last serious contention we must address is the defendants' argument that the injunction in this case is vague and overbroad. The operative portion of the injunction reads as follows:

Defendants . . . and any other on their behalf or in concert with them, are hereby enjoined from directly or indirectly:

a. interfering with the right of any member of the Certified Class of Plaintiff Clinics to conduct its business (including but not limited to the right to provide abortion services) or the right of any NOW member or any member of the Certified Class of women to avail herself of the Plaintiff Clinics' services (including but not limited to abortion services), by:

(1) blocking, impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into and egress from any building or parking lot of any Plaintiff Clinic;

(2) trespassing on the premises or the private property of any Plaintiff Clinic;

(3) destroying, damaging or stealing property of any Plaintiff Clinic, its employees, volunteers, or any woman who seeks to use the services of such a Clinic;

(4) using violence or threat of violence against any Plaintiff Clinic or any of its employees, volunteers, or any woman who seeks to use the services of such a Clinic;

b. aiding, abetting, inducing, directing, or inciting any of the acts enumerated in subsection a. of this paragraph (the "Acts") through any of the Defendants or through others; or

c. Operating an enterprise through any of the Acts described above.

This injunction does not prohibit or preclude activities that are constitutionally protected, including but not limited to the following conduct:

a. Peacefully carrying picket signs on the public property in front of any Plaintiff Clinic;

b. Making speeches on public property;
c. Speaking to individuals approaching the clinic;

d. Handing out literature on public property; and
e. Praying on public property.

This injunction shall bind Defendants . . . and all other persons in active concert with them, and who have actual or constructive notice of this Order, and any other person acting in concert with PLAN.

The defendants raise two principal objections to the scope of the injunction. First, they complain that it contains a number of terms that are vague or indefinite, and that as such, it is likely to chill a substantial amount of protected speech. Second, the defendants charge that the injunction makes them liable for the conduct of persons they do not control and for actions they do not authorize or approve. We consider each of these contentions in turn.

First, we recognize that it is a delicate task to craft an injunction that

prohibits illegal conduct when that conduct is closely tied to political protests and other protected activity. The court must tread carefully to avoid hampering protected speech. Here, we do not disagree with the proposition that some language in this injunction, taken in the abstract, is rather general. But the key question is: Compared to what? Any effort to deal with a case of this complexity will inevitably involve some imprecision. Many criminal statutes contain key terms such as the word "material" which are somewhat imprecise but have never been considered void for vagueness. The defendants in this case never proposed any alternative language for an injunction, despite several invitations from the district court to do just that, so the real question is whether the injunction the court entered is as precise as possible while still insuring that the defendants' illegal activities are enjoined.

We are satisfied that the injunction drafted by the district court here has struck the proper balance and has avoided any risk of curtailing protected activities. By its terms, the injunction prohibits only illegal conduct-- trespassing, obstructing access to clinics, damaging property, using violence or threats of violence, or aiding, abetting, inducing, directing, or inciting any of these acts. We do not find any ambiguity in the terms the district court used to describe the prohibited conduct, and as discussed above, none of this conduct is protected by the First Amendment.

Although we do not believe that the terms of the injunction would reach protected speech in any case, the injunc tion itself includes an additional safeguard. A specific provision underscores that it does not prohibit peaceful picketing, speeches, or praying on public property, attempts to speak with patients and staff, handing out literature, or any other activity protected by the First Amendment. Given this explicit language, there can be no doubt that this injunction reaches only unprotected, illegal conduct, not protected speech. The defendants' alarmist prediction that, under the terms of the injunction, a protester who engages in "months of peaceful picketing"

and then takes "two accidental footsteps onto private property" could be subject to contempt proceedings not only for trespass but also for the picketing is pure fancy and bears no relation to the actual wording of the injunction.

Nor do we find that the injunction impermissibly holds the defendants responsible for the actions of persons beyond their control. The injunction applies only to the defendants and to persons working in "active concert" with the defendants or in concert with PLAN. For that reason alone, the injunction's sweep is not so broad as the defendants suggest. Activists and protesters not closely associated with the defendants or with PLAN, an organization the defendants control, are not affected by the injunction. (This takes care of the specter of renegades who, the defendants assert, are utterly beyond their control.) Moreover, to the extent the injunction reaches the conduct of individuals not named in this lawsuit, the order enjoins those individuals from violating its mandates. If individuals acting in concert with the defendants or PLAN violate the injunction, without inducement or direction by the defendants, the violators, not the defendants, would be in contempt of the court's order. Nothing in the order purports to hold the defendants liable for actions they do not direct, incite, or control.

The injunction as it is written is narrowly tailored to prohibit the specific types of illegal conduct that the defendants have engaged in on past protest missions. As such, it does not threaten the defendants' First Amendment rights. We are confident that the district court will take as much care in enforcing the injunction as it plainly took in crafting it. Indeed, with its explicit protection of peaceful picketing, speech, literature, and prayer, perhaps in the end the injunction may further rational discourse on one of the most volatile political controversies facing the nation today. Violence in any form is the antithesis of reasoned discussion. By directing those with passionate views about the abortion controversy--on either side--away from the use of threats and violence and back to "all the peaceful means for gaining

access to the mind," the injunction the district court issued is in harmony with the fundamental First Amendment protection of free speech.

V

The defendants have raised a hodgepodge of other challenges to the judgment, none of which need detain us long. First, the defendants point out that in the plaintiffs' First and Second Amended Complaints (which were filed before the first set of appeals in the case) only the clinic plaintiffs alleged RICO claims; NOW joined only the counts alleging antitrust violations. As noted above, when the Supreme Court granted certiorari to review our earlier decision in this case, that grant was limited to questions concerning the RICO counts. The antitrust claims fell out of the case after the Court declined to review our decision with respect to them. According to the defendants, once all the counts to which NOW was a party fell out of the case, the effect was the same as a final judgment against NOW, and res judicata barred the plaintiffs from amending their complaint to include NOW as a plaintiff in the RICO counts. The district court, however, permitted the plaintiffs to file a Third Amended Complaint, after remand from this court, which included NOW as a plaintiff in the RICO counts.

Whether to allow amendments to a complaint is a question committed to the discretion of the trial court. Bethany Pharmacal Co. v. QVC, Inc., 241 F.3d 854, 861 (7th Cir. 2001). Contrary to the defendants' assertion, there was no final judgment in this case after the Supreme Court's decision to which res judicata principles could apply. The case was still pending, first in this court and then in the district court. As a general rule, amendments to complaints are liberally allowed up to and even after trial, judgment, and appeal. See United States v. Security Pac. Bus. Credit, Inc., 956 F.2d 703, 707-08 (7th Cir. 1992); see also Guse v. J.C. Penney Co., 570 F.2d 679, 680 (7th Cir. 1978) (even after plaintiff lost on appeal, there was no final judgment against plaintiff, and district court was free to allow plaintiff to file amended complaint putting forth new legal theory). The Supreme Court made it clear in its

opinion that it was evaluating the complaint only on the pleadings, see 510 U.S. at 256, 262, which is the most preliminary stage of proceedings one can imagine. The district court was thus well within its discretion in allowing NOW to continue as a plaintiff for the RICO claims in the Third Amended Complaint.

The defendants also argue that the clinics' claims are barred by res judicata. While this case was pending, one of the plaintiff clinics, Summit Women's Health Organization, filed suit in state court in Wisconsin seeking an injunction against Scheidler and several other defendants to prevent PLAN from engaging in illegal blockades during a PLAN convention in Milwaukee. The Wisconsin courts ultimately dismissed that lawsuit without prejudice as to most of the defendants. However, before the case was dismissed, Scheidler and the Summit Women's Health Organization entered into a settlement agreement that specified that "all claims against [Scheidler] relating to conduct which oc curred prior to the signing of this stipulation are hereby dismissed as to [Summit] with prejudice." The defendants argue that, because the claims that Summit raises in this case had already accrued at the time Summit entered into this stipulation, Summit is barred from bringing these claims in this lawsuit.

We need not consider what preclusive effect the Wisconsin settlement might have, because the defendants waived this issue in the district court. Res judicata is an affirmative defense that is waived if a party does not plead it. Fed. R. Civ. P. 8(c). Under the local rules of the Northern District of Illinois, the defendants were required to list all their defenses in their trial brief, and any defenses not listed were waived. The defendants admit that they did not list res judicata based on the Wisconsin litigation as an affirmative defense in their trial brief, and accordingly they have lost the opportunity to argue that issue here. Although we find that this claim is waived, we also note that, even if it were not waived and if the Wisconsin settlement had a preclusive effect in this case, the preclusion could run only between Summit and Scheidler and would not affect any of the other plaintiffs, including the class members,

or any of the other defendants. The injunction would not be affected, all of the defendants would remain jointly liable for the damages to Delaware Women's Health Organization, and all of the defendants except Scheidler would remain liable to Summit. The practical effect of any preclusion would therefore be negligible.

The defendants have also urged this court to decertify the two classes, arguing that NOW and the named clinics are inadequate class representatives. The defendants particularly object to the district court's decision to include in the NOW class women who are not members of NOW, arguing that because NOW is a partisan advocacy group and the issues involved in this case concern a matter of great social controversy, NOW is likely to have interests antagonistic to the views of some members of the class. Class certification decisions are committed to the discretion of the district court, however, see Chavez v. Illinois State Police, 251 F.3d 612, 629 (7th Cir. 2001), and we find that the district court's decision to certify the two classes here was well within the court's discretion. It is inaccurate in any event to imply that the district court certified a class of "all women." The court did no such thing. Instead, it certified a class that included only those women, whether or not members of NOW, whose right to seek abortion services has been or will be interfered with by the defendants. In order for these women's interests to be antagonistic to the claims NOW is bringing, the defendants would have to argue that at least some women in the class want to seek abortion services, but do not want to be free from harassment and intimidation while doing so. This scenario strikes us as exceedingly unlikely; at the very least, we agree with the district court that it "is clearly speculative and projects personally held views onto the plaintiff class." National Organization for Women, Inc. v. Scheidler, 172 F.R.D. 351, 362 (N.D. Ill. 1997).

As to the defendants' more general arguments that the named plaintiffs have not performed adequately as class representatives, we note that the named plaintiffs have pursued this litigation

diligently for fifteen years, through a trip to the Supreme Court of the United States and a seven-week trial, and ultimately were successful in securing a nationwide injunction against the defendants prohibiting the conduct they set out to challenge. Given this record of performance, we cannot say that the district court in any way abused its discretion in certifying these classes.

The defendants have also argued that the conduct in which they engaged is not prohibited by RICO for a number of reasons. First, the plaintiffs alleged as predicate acts numerous violations of the federal extortion statute, the Hobbs Act, 18 U.S.C. sec. 1951, and the defendants argue that the Hobbs Act does not apply to their conduct. The defendants' primary contention on this point is that the Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear," and that the things the plaintiffs claim were taken here--the class women's rights to seek medical services from the clinics, the clinic doctors' rights to perform their jobs, and the clinics' rights to provide medical services and otherwise conduct their businesses-- cannot be considered "property" for purposes of the Hobbs Act. However, this circuit has repeatedly held that intangible property such as the right to conduct a business can be considered "property" under the Hobbs Act, see, e.g., United States v. Anderson, 716 F.2d 446, 450 (7th Cir. 1983), and we will not revisit that holding here.

In a similar vein, the defendants assert that, even if "property" was involved, the defendants did not "obtain" that property; they merely forced the plaintiffs to part with it. Again, this argument is contrary to a long line of precedent in this circuit holding that "as a legal matter, an extortionist can violate the Hobbs Act without eitherseeking or receiving money or anything else. A loss to, or interference with the rights of, the victim is all that is required." United States v. Stillo, 57 F.3d 553, 559 (7th Cir. 1995).

In addition to their challenges to the application of the Hobbs Act, the defendants argue that the district court

erred in giving the jury a generic instruction describing the elements of the state law extortion offenses the plaintiffs alleged as additional predicate acts. According to the defendants, there are substantial differences in the extortion laws of the states in which these alleged predicate acts occurred, and the district court's attempt to cover all the relevant state laws with a single, generic instruction impermissibly discounted these differences. Without expressing an opinion on whether this approach was permissible, we simply note that, if any error occurred, it was harmless. The jury found that the defendants committed 21 predicate acts under the Hobbs Act alone, which is far in excess of the two predicate acts that RICO requires. In the face of this finding, any error in the state extortion law instructions, which could at most have affected the jury's decision on the additional state-law predicate acts it found, could not have had any effect on the outcome of this case.

Finally, while this appeal was pending, the defendants filed motions in the district court seeking relief from the judgment under Rules 60(b)(2) and (3). The district court denied the motions, and the defendants appealed. We consolidated that appeal with this case and suspended briefing on the 60(b) issues. We have reviewed the defendants' motions in the trial court and the trial court's resolution of those issues, and we conclude that no further briefing on the issues is necessary.

"Rule 60(b) relief is an extraordinary remedy granted only in exceptional circumstances." Rutledge v. United States, 230 F.3d 1041, 1052 (7th Cir. 2000). Our review of the district court's decision denying relief is deferential, and we will reverse only if the district court has abused its discretion. J&W Fence Supply Co. v. United States, 230 F.3d 896, 898 (7th Cir. 2000). We find no abuse of discretion in this case. In their 60(b) motions, the defendants argued that they had newly discovered evidence relating to two specific incidents described by witnesses during the trial. In addition, the defendants posited that newly discovered evidence called into doubt whether an anonymous

witness who testified at the trial in fact needed to remain anonymous. The district court denied the motions on the grounds that the defendants had documents in their possession from which they could have discovered most of the "new" evidence for well over a decade, and that relief at this late date accordingly was not warranted. In addition, the court noted that it was very unlikely that any of the "new" evidence, if admitted at trial, would have had any impact on the jury's verdict. Given that Rule 60 motions cannot be used to present evidence that with due diligence could have been introduced before judgment, Rutledge, 230 F.3d at 1052, or to put forth evidence that is not material or that would likely not change the result at trial, Jones v. Lincoln Elec. Co., 188 F.3d 709, 732 (7th Cir. 1999), we find no error in the district court's denial of relief.

We have considered all of the defendants' remaining contentions, but find none that requires comment. For the foregoing reasons, the judgment of the district court is Affirmed in all respects.

FOOTNOTE

/1 The remedial provisions of the Clayton Act are actually spread over far more than the two sections the defendants mention. In addition to sec.sec. 4 and 16, the Clayton Act also includes (as codified) 15 U.S.C. sec. 15(b) (suits for actual damages brought by foreign governments), 15 U.S.C. sec. 15a (suits for treble damages brought by the United States for its own injuries to business or property), 15 U.S.C. sec. 15c (parens patriae suits brought by state attorneys general for treble damages on behalf of natural persons in the state), and 15 U.S.C. sec. 25 (actions for injunctive relief brought by the Attorney General).