# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 99-3076, 99-3336, 99-3891, 99-3892, and 01-2050

NATIONAL ORGANIZATION FOR WOMEN, INC., *et al.*,

*Plaintiffs-Appellees*,

*v.*

JOSEPH M. SCHEIDLER, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 86 C 7888—**David H. Coar**, *Judge.*

ON PETITIONS FOR REHEARING AND
REHEARING EN BANC[*]

DECIDED JANUARY 28, 2005

Before ROVNER, WOOD and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* On February 26, 2004, this court
issued an order responding to the remand of this case from
the Supreme Court of the United States. See *Nat'l Org. for*

---

[*] After a vote, a majority of the judges in regular active service
did not wish to hear this case *en banc*. Chief Judge Flaum, Judge
Manion and Judge Kanne voted to grant rehearing *en banc*. Judge
Ripple took no part in consideration or decision of this case.

*Women, Inc. v. Scheidler,* 2004 WL 375995 (7th Cir. Feb. 26, 2004), on remand from *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 397 (2003) (*NOW II*). In that order, we acknowledged the issues that were resolved by the Supreme Court, and we identified one question that remains in the case. The defendants then filed petitions for rehearing and rehearing *en banc* from that order. This opinion responds to those petitions.

# I

For the convenience of all, we begin by reproducing the relevant text of the unpublished order that we issued on that date:

> In 1986, the National Organization for Women (NOW) and two health clinics that perform abortions ("plaintiffs") filed this class action alleging that defendants, a coalition of antiabortion groups called the Pro-Life Action Network (PLAN), Joseph Scheidler, and other individuals and organizations that oppose abortion, engaged in conduct amounting to a pattern of extortion in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961-68 (RICO). A more detailed account of the facts and the lengthy procedural history of this litigation is provided in the Supreme Court's first opinion in this case, *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994) (*NOW I*), and in our prior decisions, *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), and *National Organization for Women, Inc. v. Scheidler*, 986 F.2d 612 (7th Cir. 1992).

> After the Supreme Court in *NOW I* remanded the case, the district court conducted a seven-week trial, at which the plaintiffs introduced evidence of hundreds of acts committed by the defendants or others acting in

concert with PLAN which, the plaintiffs contended, constituted predicate acts under RICO. In response to special interrogatories, the jury found that the defendants or others associated with PLAN committed 21 violations of federal extortion law (the Hobbs Act, 18 U.S.C. §1951), 25 violations of state extortion law, 25 instances of attempting or conspiring to commit either federal or state extortion, 23 violations of the Travel Act, 18 U.S.C. §1952, 23 instances of attempting to violate the Travel Act, and four "acts or threats of physical violence to any person or property." On this basis, the jury awarded damages to the two named clinics, and the district court issued a permanent nationwide injunction prohibiting the defendants from conducting blockades, trespassing, damaging property, or committing acts of violence at the class clinics. The defendants appealed a number of issues relating to the conduct of the trial and the issuance of the injunction. We affirmed the district court's judgment in all respects. *Scheidler*, 267 F.3d at 693.

The defendants then filed a petition for a writ of certiorari with the United States Supreme Court, which the Court granted with respect to two of the three questions presented by the petition. *Scheidler v. Nat'l Org. for Women, Inc.*, 535 U.S. 1016 (2002). The Court limited its grant of certiorari to the following questions:

1. Whether the Seventh Circuit correctly held, in acknowledged conflict with the Ninth Circuit, that injunctive relief is available in a private civil action for treble damages brought under [RICO].

2. Whether the Hobbs Act, which makes it a crime to obstruct, delay, or affect interstate commerce "by robbery or extortion" and which defines "extortion" as "the obtaining of property from another, with [the owner's] consent," where such consent is "induced by the wrongful use of actual or threatened

force, violence, or fear"—criminalizes the activities of political protesters who engage in sit-ins and demonstrations that obstruct the public's access to a business's premises and interfere with the freedom of putative customers to obtain services offered there.

Pet. for Writ of Cert., 2002 WL 32134867 (U.S. Jan. 28, 2002) (No. 01-1118) (internal citation omitted). In its opinion, the Court explained that it granted certiorari to determine "whether petitioners committed extortion within the meaning of the Hobbs Act" and "whether respondents, as private litigants, may obtain injunctive relief in a civil action" under RICO. *NOW II,* 537 U.S. at 397. The Court held that "petitioners did not commit extortion because they did not 'obtain' property from respondents as required by the Hobbs Act," and this determination "renders insufficient the other bases or predicate acts of racketeering supporting the jury's conclusion that petitioners violated RICO." *Id.* It therefore "reverse[d] without reaching the question of the availability of private injunctive relief under §1964(c) of RICO," *id.*, and held that "[w]ithout an underlying RICO violation, the injunction issued by the District Court must necessarily be vacated," *id.* at 411.

On remand to this court, the parties submitted Statements of Position pursuant to Circuit Rule 54. Plaintiffs argue that, although the Court in *NOW II* disposed of the 117 extortion-based predicate acts under RICO, the defendants did not petition for a writ of certiorari on the four predicate acts involving "acts or threats of physical violence to any person or property" and, accordingly, the Court did not decide whether these acts alone could support the district court's injunction. In response, defendants contend that the Hobbs Act does not outlaw "physical violence" apart from extortion and robbery, and therefore the Supreme Court's holding that the

defendants did not commit extortion precludes a finding that the four acts or threats of violence might independently support the injunction. We remand to the district court to address this issue—which never before in this litigation has been the subject of full briefing or judicial consideration—in the first instance.

Although "[a]n order limiting the grant of certiorari does not operate as a jurisdictional bar," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 246 (1981), the Supreme Court has consistently adhered to its Rule 14.1(a), which provides that "[o]nly the questions set out in the petition, or fairly included therein, will be considered by the Court." See *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 202 (2002); *Glover v. U.S.*, 531 U.S. 198, 205 (2001). Given the Court's general refusal to decide issues outside the questions presented by a petition for a writ of certiorari, see, *e.g.*, *Lopez v. Davis*, 531 U.S. 230, 244 n.6 (2001); *West v. Gibson*, 527 U.S. 212, 233 (1999); *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 140 (1998), we will not presume that in this case it went beyond the scope of its grant of certiorari, which it characterized as "whether petitioners committed extortion within the meaning of the Hobbs Act," to hold *sub silentio* that the four acts or threats of physical violence found by the jury cannot support the injunction. We note that the Court's opinion in *NOW II* makes no mention of these four predicate acts, and the parties' briefs before the Court reference these acts only in passing in footnotes. To conclude that the Court found these four predicate acts insufficient to support the district court's injunction would therefore require that we find both that the Court went beyond the scope of its grant of certiorari, and that it did so with respect to an issue not briefed by the parties and not discussed in its opinion. We decline to draw such a conclusion.

Instead, we remand to the district court to determine whether the four predicate acts involving "acts or threats

of physical violence to any person or property" are sufficient to support the nationwide injunction that it imposed. See *Glover*, 531 U.S. at 205 ("As a general rule . . . we do not decide issues outside the questions presented by the petition for certiorari. Whether these issues remain open, and if so whether they have merit, are questions for the Court of Appeals or the District Court to consider and determine in the first instance." (citing Sup. Ct. R. 14.1(a))). As part of this inquiry, the court may find it necessary to interpret the language of the Hobbs Act, which provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. §1951(a). Specifically, the court may need to determine whether the phrase "commits or threatens physical violence to any person or property" constitutes an independent ground for violating the Hobbs Act or, rather, relates back to the grounds of robbery or extortion. In the alternative, the court may conclude that the proper interpretation of §1951(a) is immaterial, if it decides that the four acts or threats of physical violence found by the jury are not sufficient standing alone to support the nationwide injunction. As the parties' Circuit Rule 54 submissions offer only a preliminary discussion of these issues, and neither this court nor the district court has addressed them previously, we consider it best to remand the case to the district court.

The February 26 order, in summary, thus concludes that one narrow question has yet to be resolved in the case. The Court did not have before it, and thus made no ruling on, the question whether four more predicate acts involving "acts

or threats of physical violence to any person or property" could support a more narrow injunction. We concluded that the better part of wisdom was to remand that limited question to the district court.

## II

The petitions for rehearing take issue with two aspects of our decision on remand: first, our finding that one issue remains in the case that needs to be tied up, and second, what the defendants believe is our implicit resolution of an important question of statutory interpretation regarding the scope of the Hobbs Act. Despite the arguments the dissenting judges have presented, we continue to believe that the Court's opinion left open the issue we identified. We take this opportunity to underscore the fact that we have not, at this point, ruled either implicitly or explicitly on the Hobbs Act issue, for reasons of judicial economy and restraint. As we explain below, there is no need for this court to decide a question that may not even be pertinent to the case once the district court has looked at the points that remain on remand.

As we noted in the order reproduced above, the Supreme Court's opinion did not address the legal implications of the remaining four acts of physical violence. Indeed, any reader will see that the Court had nothing at all to say about them, for the understandable reason that they were not included in the petitions for *certiorari*. We have nothing to add on that point to what we have already written. With respect to the Hobbs Act dispute, which we describe in a moment, it seemed possible (perhaps even likely) that the district court might come to the conclusion that the four acts of physical violence are not sufficient standing alone to justify any injunction at all. It is not even clear whether the acts of violence were sufficiently well defined to justify any injunctive relief. Moreover, it is too late in the day for the

plaintiffs to try to prove an entitlement to damages associated with those violations. They had their chance to do so when the case was tried in the district court, and there is nothing in the Supreme Court's opinion that would justify re-opening the original judgment on this point. The only remaining question, to repeat, is whether a different injunction, tailored to the violations found, would be appropriate. See, *e.g.*, *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995). The district court is in the best position to decide what to do in these circumstances, given its extensive familiarity with the voluminous record in this case. This is not, however, an invitation either to the court or to the parties to re-open that record. If there is anything at all that is to be done, it must be based on the record that has already been built.

If and only if the district court concludes that some form of injunctive relief would be justified based on the four remaining predicate acts found by the jury, that court will have to confront a more complex legal issue, namely, whether the acts or threats of violence language in the Hobbs Act may serve as an independent predicate act under RICO. The relevant part of the Hobbs Act reads as follows:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, *or commits or threatens physical violence* to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. §1951(a) (emphasis added). As the defendants' petitions for rehearing and plaintiffs' answer demonstrate, there are two possible interpretations of this language. "First it may simply forbid committing or threatening violence in furtherance of a plan to obstruct commerce by robbery or extortion." Craig M. Bradley, *NOW v. Scheidler: RICO Meets*

*the First Amendment,* 1994 SUP. CT. REV. 129, 142-43 (1994). We will refer to this as the "two-way" interpretation, where the two acts are robbery and extortion. "The other possible reading . . . forbids threatening or committing physical violence in furtherance of a plan to 'obstruct, delay, or affect commerce' (other than through robbery or extortion)." *Id.* at 143. Under the latter reading, the Hobbs Act identifies three different ways in which illegal interference with interstate commerce may occur: (1) by robbery, (2) by extortion, or (3) by physical violence. We will refer to this as the "three-way" interpretation.

The choice between these two competing interpretations is not obvious. Grammatically, the text can be read either way without undue strain. Moreover, there is no decisional law that throws light on which of the two readings is to be preferred. The Supreme Court has had no occasion to address the question. The Court has, however, had pertinent things to say about the scope of the Hobbs Act, and it has recently reaffirmed the utility of taking a "holistic" approach to questions of statutory interpretation, see *Koons Buick Pontiac GMC, Inc. v. Nigh,* 125 S.Ct. 460, 466-67 (2004). With that in mind, we take a closer look at this issue.

In *Stirone v. United States,* 361 U.S. 212 (1960), the Supreme Court described the Hobbs Act as follows: the "Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress had to punish interference with interstate commerce by extortion, robbery or physical violence*." Id.* at 215. This phraseology suggests that the Court saw three distinct types of predicate acts in the statute. See also *United States v. Peterson,* 236 F.3d 848, 851 (7th Cir. 2001); *United States v. Carmichael,* 232 F.3d 510, 516 (6th Cir. 2000); *United States v. Rodriguez,* 218 F.3d 1243, 1244 (11th Cir. 2000). None of these cases, however, squarely confronted the question whether an act of physical violence constitutes a distinct kind of predicate act—a point that the Ninth Circuit underscored in *United States v.*

*Yankowski,* 184 F.3d 1071 (9th Cir. 1999), which held that *Stirone* did not resolve the issue and went on to adopt the two-way reading of the statute.

In their petition for rehearing, the defendants identify language in the Supreme Court's opinion in *NOW II* that, they argue, indicates that the Court itself has now opted for the two-way interpretation. But the passage to which they point offers at best a subtle indication, and at worst it is not helpful at all. In the course of discussing the legislative history of the Hobbs Act, the Court noted that Congress used the Penal Code of New York as a model for the Act. *NOW II* at 403. It emphasized that the New York Penal Code distinguished "between extortion and the separate crime of coercion," which "involved the use of force or threat of force to restrict another's freedom of action." *Id.* at 405. "With this distinction between extortion and coercion clearly drawn in New York law prior to 1946," the Court explained, "Congress's decision to include extortion as a violation of the Hobbs Act and omit coercion is significant assistance to our interpretation of the breadth of the extortion provision." *Id.* at 406. The Court acknowledged that "coercion and extortion certainly overlap to the extent that extortion necessarily involves the use of coercive conduct to obtain property," but nonetheless it stressed that "there has been and continues to be a recognized difference between the two crimes, and we find it evident that this distinction was not lost on Congress." *Id.* at 407-08 (internal citations omitted). In drawing this conclusion and in declining to subsume the crime of coercion into the Hobbs Act's reference to "extortion," the Court quoted *McNally v. United States,* 483 U.S. 350 (1987), for the proposition that "when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *NOW II*, 537 U.S. at 409 (quoting *McNally*, 483 U.S. at 359-60); see also *Leocal v. Ashcroft,* 125 S.Ct. 377, 384 n.8 (2004). It thus concluded

that "[i]f the distinction between extortion and coercion, which we find controls these cases, is to be abandoned, such a significant expansion of the law's coverage must come from Congress, and not from the courts." 537 U.S. at 409.

This discussion, however, addressed the question whether the definition of extortion was elastic enough to encompass the acts of coercion whereby the defendants and their allies were attempting to block women from clinics where abortions were performed. The focus was on the deprivation of the women's right to obtain the services they desired and whether that amounted to "extortion." It is true that the New York Penal Code defined coercion to include certain acts or threats of violence against persons or property, see *NOW II*, 537 U.S. at 406 n.10 (quoting from New York Penal Code §530 (1909)). It is also true that the Court concluded that Congress affirmatively chose not to list "coercion" as a separate ground for Hobbs Act liability. Nonetheless, the Court was not addressing the analytically distinct question whether the conduct at issue could be considered as acts of violence that obstructed, delayed, or affected interstate commerce, or that obstructed, delayed, or affected the movement of articles or commodities in commerce. Had it done so, one might have expected some discussion of cases like *United States v. Morrison,* 529 U.S. 598 (2000) (holding in part that the Violence Against Women Act could not be sustained as a regulation of activity affecting interstate commerce) and *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753 (1994) (upholding in part an injunction protecting access to abortion clinics entered pursuant to state law); see also 18 U.S.C. §248 (freedom of access to clinics), upheld in *United States v. Wilson,* 154 F.3d 658 (7th Cir. 1998). No such discussion appears, for the simple reason that the issue was not before the Court.

The Sixth and Ninth Circuits have both had occasion to address the question how the Hobbs Act should be interpreted. See *United States v. Yankowski, supra,* 184 F.3d 1071; *United States v. Franks,* 511 F.2d 25 (6th Cir. 1975).

They both have concluded that the Act establishes just two RICO predicate acts—robbery and extortion—and that the phrase "or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section" simply modified the words "robbery" and "extortion." In *Yankowski,* the Ninth Circuit considered the question whether an anti-abortion protester who set fire to a clinic roof could be convicted under the Hobbs Act. See 184 F.3d at 1072. The court rejected the three-part reading of the Act, explaining that "the statutory language clearly requires that the violent act pertain to a violation of *this section,* not merely to a violation of 'the law' generally." *Id.* at 1073. On that basis, it concluded that "[a] person may violate the Hobbs Act by committing or threatening a violent act against person or property, but only if it is in furtherance of a plan to interfere with commerce *by extortion or robbery*." *Id.* In support of that interpretation, the court relied on the language of the predecessor to the Hobbs Act, the Anti-Racketeering Act of 1934, which it described as providing that "[a]ny person who, in connection with or in any degree affecting trade or commerce (a) commits or attempts extortion of money, or (b) obtains property through extortion, or (c) 'commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate sections (a) or (b),' or (d) conspires with respect to (a), (b), or (c). . . shall be imprisoned or fined." *Id.* at 1073 n.5. The Sixth Circuit came to essentially the same result in *Franks, supra.*

Notably, in both *Yankowski* and *Franks* the government had argued unsuccessfully that the statute described three independent predicate acts. It appears to us that the United States may still be taking that position with respect to the scope of the Hobbs Act for purposes of criminal prosecutions, though we cannot be sure without requesting the views of the Solicitor General. We note, however, that in an unpub-

lished opinion, the Fourth Circuit stated that "[t]here are two essential elements of a Hobbs Act conviction: interference with interstate commerce, and a crime of robbery, extortion or violence." *United States v. Milton,* 153 F.3d 724, 1998 WL 468812, at *1 (4th Cir. Aug. 4, 1998). It seems likely that this court was expressing agreement with the position of the government, though once again, it is impossible to know.

The defendants also invoke the rule of lenity mentioned by the Supreme Court in *NOW II* and *Leocal* in support of the two-way interpretation. But this argument is premised on the doomsday scenario they foresee if the Act is read to permit three independent predicate acts. They predict that under the three-way interpretation, "the traditional state-law offenses of malicious destruction of property, reckless endangerment, and even assault would be Hobbs Act violations punishable by 20 years in federal prison." Operation Rescue adds that this would make the Hobbs Act a "breathtakingly broad general federal anti-violence statute" and it would raise "obvious constitutional problems" under the Supreme Court's Commerce Clause jurisprudence. In our view, these predictions greatly overstate the case. The Hobbs Act itself contains a jurisdictional element that limits its application to anyone who "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. §1951(a); see also *Jones v. United States*, 529 U.S. 848 (2000) (adopting a narrow interpretation of the federal arson statute, 18 U.S.C. §844(i), to avoid constitutional problems). We are satisfied that we have a normal question of statutory interpretation before us and that the sky is not likely to fall whichever way it is resolved.

The plaintiffs argue that the "plain" text of §1951 favors their position. They adopt the reasoning offered by Professor Bradley:

> [The Hobbs Act] may simply forbid committing or threatening violence in furtherance of a plan to obstruct com-

merce by robbery or extortion. But this interpretation makes no sense! Robbery and extortion frequently involve the commission (robbery) or threat (extortion) of violence, though "extortion" covers other threats as well. Moreover, the "robbery and extortion" clauses also forbid "attempts" and conspiracies. Thus, under this reading, the "physical violence" clause would be less inclusive, and hence would add nothing, to the preceding "robbery" and "extortion" clauses. One who commits violence in furtherance of a plan to commit robbery or extortion has either committed, attempted, or conspired to commit robbery or extortion and thus has violated the first clause, rendering the third clause nugatory.

Bradley, *supra,* at 142-43. At a minimum, it is hard to argue with the proposition that any reading of the Hobbs Act ought to take into account the statute as a whole. That means that the language of §1951(a) should be understood in light of the definitions provided by §1951(b). In the latter subsection, the Act defines "robbery" and "extortion" so that they already cover all acts of physical violence that are undertaken in furtherance of the respective offense. "Robbery" is defined in part as "the unlawful taking or obtaining of personal property from the person . . . against his will, by means of *actual or threatened force, or violence, or fear of injury,* immediate or future, to his person or property." 18 U.S.C. §1951(b)(1) (emphasis added). Likewise, "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of *actual or threatened force, violence, or fear,* or under color of official right." *Id.* at §1951(b)(2) (emphasis added).

Recognizing the well-worn canon of statutory interpretation under which a court should avoid making one part of a statute meaningless, the defendants have tried to think of cases in which the "physical violence" clause would cover individuals who were acting in furtherance of a plan to commit robbery or extortion, but whose acts do not already

fall within the definitions of robbery, extortion, or attempts or conspiracies to rob or extort. Their efforts reveal the difficulty they face in this connection. Anyone who commits physical violence to a person or property in furtherance of a plan of robbery or extortion would almost certainly be found to have attempted one of those crimes, or, if others are involved, to have conspired to commit one or the other. Operation Rescue, for instance, offers the example of the "subordinate 'enforcer' who, while not himself extorting or robbing anything, harms people or property when the extortionist or robber does not obtain the desired payment from the victim." But such a subordinate "enforcer" would fall squarely within the Act's conspiracy language. Another example the defendants offer is the case of one who threatens violence in furtherance of a "personal" plan to rob a bank or to commit extortion, without either conspiring with anyone else or taking enough steps to amount to an attempted crime. It is hard to see how such a remote threat could be in furtherance either of extortion or robbery (defendants' view) or in furtherance of a plan to "obstruct, delay" or otherwise hamper the movement of goods in commerce (plaintiffs' view). It seems unlikely that Congress included the "violence" language to capture such a tiny set of academic hypotheticals.

Even if one were to conclude that the plain language approach favors the interpretation urged by the plaintiffs, there is still legislative history to consider. The defendants argue that the legislative history of the Hobbs Act should be allowed to trump the result one reaches looking at the statute as a whole. Many judges believe that legislative history should be used, if at all, only to disambiguate language that does not yield to any other mechanism. The Supreme Court's *Koons Buick* decision indicates that legislative history is also appropriate if the plain language leads one to an absurd result. But we see nothing absurd in the three-way interpretation the plaintiffs have urged. To the con-

trary, it is the approach favored by the defendants that threatens to leave one with an entire clause in the statute that has no meaningful function to perform.

Having said that, we acknowledge that the legislative history indicates that Congress was principally concerned with the effects of robbery and extortion on interstate commerce (though it never affirmatively negated the three-way interpretation, either at the time of the 1948 revision of the Criminal Code or thereafter). See generally *Callanan v. United States,* 364 U.S. 587, 591 & n.5 (1961). Until the 1948 revision and codification of Title 18 of the U.S. Code, the statute explicitly linked the "acts of physical violence" clause to the prohibition on robbery and extortion. See Pub. L. No. 486, 60 Stat. 420 (1946). In 1948, however, the Act assumed its present form. See Pub. L. No. 772, 62 Stat. 793-94 (1948). While these revisions were intended to be formal, stylistic changes, it is not beyond the realm of possibility that the revisers may have made certain substantive changes, either advertently or inadvertently. Compare, for example, the similar fate of the Judicial Code, which was recodified at the same time as the Criminal Code, and which changed in a number of substantive respects as a result. See generally William W. Barron, The Judicial Code, 8 F.R.D. 439 (1948-49). Moreover, the present form of the Act has been in effect for more than 55 years, and the safest approach may be to take it at face value.

### III

We continue to believe, as we did when the February 26 order was issued, that it would be imprudent to resolve this problem of statutory interpretation at this stage of the litigation of this particular case. Most importantly, as we indicated at the outset of this opinion, it may be unnecessary to the resolution of this case. Second, the brief discussion we have included in this opinion demonstrates that the issue is a complex one that deserves not only full brief-

ing and participation by all parties, but also input from the United States, given the effect of any ruling on the scope of the Hobbs Act with or without RICO in the picture. Rather than launch such an ambitious project at the tail end of litigation that has been running for almost twenty years, we prefer a wait-and-see approach.

In closing, we wish to re-emphasize that this remand is not a "green light" to start this old litigation anew. The plaintiffs have lost their bid to have a nationwide injunction based on the 117 acts that the Supreme Court has now decreed do not qualify as "extortion" for purposes of the Hobbs Act and RICO. From what we can tell of the record, it appears that it would be an abuse of discretion for the district court to re-enter any nationwide injunction based only on the four remaining acts of violence found by the jury. Such an injunction would violate the rule requiring courts to tailor injunctive relief to the scope of the violation found. We note as well that the Freedom of Access to Clinic Entrances Act, 18 U.S.C. §248, has now been in effect for five more years since the district court first considered the necessity of a nationwide injunction, and experience may require a reassessment of the Act's impact. Finally, it is too late in the day for the plaintiffs to try to seek additional damages relief for acts that they could have addressed at the original trial. The only remaining question is therefore whether any injunction is appropriate to redress the four acts of physical violence that the jury found had taken place and that were not encompassed within the Supreme Court's ruling. This does not open Pandora's Box. It merely resolves the final loose ends in this long-running litigation in a manner that is fair to both sides and that acknowledges the need to resolve all properly presented issues.

The case is REMANDED to the district court for further proceedings consistent with this opinion.

MANION, *Circuit Judge*, joined by KANNE, *Circuit Judge*, dissenting from the denial of petition to rehear *en banc*. Following more than eighteen years of litigation, a seven-week jury trial, and two trips to the United States Supreme Court, the Supreme Court held in *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003), that "*all* of the predicate acts supporting the jury's finding of a RICO violation *must be reversed*," and that "*[w]ithout an underlying RICO violation*, the injunction issued by the District Court must necessarily be vacated." *Id.* at 410 (emphasis added). Nonetheless, on remand, a panel of this court concluded that not "*all* of the predicate acts" were reversed, but that the jury's finding of four predicate acts or threats of violence remained viable. *National Org. for Women, Inc. v. Scheidler*, 2004 WL 375995, at *3 (7th Cir. Feb. 26, 2004). Today on rehearing, the panel reaffirms that remand order, while unnecessarily debating, but not deciding, the scope of the Hobbs Act. Because I believe that the Supreme Court meant what it said, and because, in any event, the underlying four predicate acts of violence cannot, as a matter of law, constitute an independent violation of the Hobbs Act, I dissent from the denial of the petition for rehearing en banc.

The facts and procedural history of this case are provided in detail in the Supreme Court's decision in *Scheidler*. In short, in *Scheidler*, following a seven-week trial, a jury concluded that Scheidler and other individuals and organizations violated the civil provisions of RICO: the jury concluded that the defendants committed 21 violations of the Hobbs Act, 25 violations of state extortion law, 25 instances of attempting or conspiring to commit either federal or state extortion, 23 violations of the Travel Act, 23 instances of attempting to violate the Travel Act, and four acts or threats of physical violence to any person or property.[1] The jury awarded

---

[1]  The plaintiffs acknowledge that the "acts or threats of physical
(continued...)

plaintiff, the National Women's Health Organization of Delaware, Inc., $31,455.64, and the National Women's Health Organization of Summit, Inc., $54,471.28, with the damages trebled under RICO. The district court then entered an injunction prohibiting certain illegal protest actions. The defendants appealed to this court and this court affirmed. *National Org. for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001). The Supreme Court granted certiorari "to answer two questions. First, whether petitioners committed extortion within the meaning of the Hobbs Act, 18 U.S.C. § 1951. Second, whether respondents, as private litigants, may obtain injunctive relief in a civil action pursuant to 18 U.S.C. § 1964 of the Racketeer Influenced and Corrupt Organization Act (RICO)." *Id.* at 397.

On appeal, the Supreme Court first considered whether the defendants committed extortion within the meaning of the Hobbs Act. The Court held that the crime of extortion under the Hobbs Act required the defendants to obtain or to seek to obtain property. The Court then concluded: "Because we find that petitioners did not obtain or attempt to obtain property from respondents, we conclude that there was no basis upon which to find that they committed extortion under the Hobbs Act." *Id.* The Court did not end there, however, because "[t]he jury also found that petitioners had committed extortion under various state-law extortion statutes, a separate RICO predicate offense." *Id.* at 409. Thus, the Court considered whether the verdict could stand based on the jury's findings of state law extortion. Again, the Court concluded "[b]ecause petitioners did not obtain or attempt to obtain respondents' property, both the state extortion claims and the claim of attempting or conspiring to commit state extortion were fatally flawed." *Id.* at 410. Having dis-

[1] (...continued)
violence" predicate acts were based on the Hobbs Act, 18 U.S.C. § 1951(a), and were not state law claims.

posed of the Hobbs and state extortion predicate acts, the
Supreme Court then concluded that "[t]he 23 violations of
the Travel Act and 23 acts of attempting to violate the Travel
Act also fail. These acts were committed in furtherance of
allegedly extortionate conduct. But we have already deter-
mined that petitioners did not commit or attempt to commit
extortion." *Id.* at 410.

Significantly, the Supreme Court then held: "Because *all*
of the predicate acts supporting the jury's findings of a RICO
violation *must be reversed*, the judgment that petitioners
violated RICO *must also be reversed*. Without an underlying
RICO violation, the injunction issued by the District Court
*must necessarily be vacated*. We therefore need not address
the second question presented—whether a private plaintiff
in a civil RICO action is entitled to injunctive relief under
18 U.S.C. § 1964. The judgment of the Court of Appeals is
accordingly *Reversed*." *Id.* at 411 (emphasis added). The
Supreme Court then entered an order stating "that the
judgment of the above court in these causes is reversed with
costs, and the cases are remanded to the United States
Court of Appeals for the Seventh Circuit for further pro-
ceedings in conformity with the opinion of this Court." At
that point, we should have closed the case.

But even with the Supreme Court's explicit holding that
"*all* of the predicate acts supporting the jury's finding of a
RICO violation *must be reversed*," and its directive that "the
injunction issued by the District Court *must necessarily be
vacated*," our court remanded this case to the district court
for further proceedings, namely to determine "whether the
four predicate acts involving 'acts or threats of physical
violence to any person or property' are sufficient to support
the nationwide injunction that it imposed." *Scheidler*, 2004
WL 375995, at *3. The panel reasoned that remand was
necessary because the Supreme Court had not granted
certiorari on that issue and, therefore, the question re-
mained open. In my view, the order directly conflicts with

the Supreme Court's opinion. It also rests on an impermissible reading of the Hobbs Act, and unnecessarily revives a case that is already more than eighteen years old.

Although the Supreme Court did not expressly consider whether the jury's finding of four predicate acts of violence to persons or property could support the jury's verdict on the plaintiffs' RICO claim, the Supreme Court clearly stated that "*all* of the predicate acts supporting the jury's finding of a RICO violation *must be reversed.*" This unequivocal holding negates any reasonable inference that those four predicate acts remain an issue. The panel concludes otherwise by noting that the Supreme Court did not grant certiorari to resolve that issue.

But, the Supreme Court did specifically grant certiorari to consider the question of whether a private litigant in a civil RICO action is entitled to injunctive relief, but then found it unnecessary to address that question because there was no "underlying RICO violation . . . ." *Scheidler*, 537 U.S. at 411. This is significant because if the four threats or acts of violence claims remained viable, as the panel concludes and the plaintiffs argue, there would be an "underlying RICO violation," and it would have been necessary for the Supreme Court to address the second question for which it had granted certiorari. Yet, the Supreme Court expressly stated that because there was no underlying RICO violation, it was unnecessary to consider whether private litigants could obtain injunctive relief under RICO. *Id.* at 411. Thus, the panel's remand order, which allows for the possibility that there is still an "underlying RICO violation," is again inconsistent with the Supreme Court's opinion.

Moreover, although the Supreme Court did not grant certiorari to consider the state law extortion claims or the Travel Act claims, it nonetheless considered the validity of those claims, as they depended entirely on the Supreme Court's resolution of the extortion claims for which it had

granted certiorari. *See Scheidler*, 537 U.S. at 410 ("The 23 violations of the Travel Act and 23 acts of attempting to violate the Travel Act also fail. These acts were committed in furtherance of allegedly extortionate conduct. But we have already determined that petitioners did not commit or attempt to commit extortion."); *id.* ("Because petitioners did not obtain or attempt to obtain respondents' property, both the state extortion claims and the claim of attempting or conspiring to commit state extortion were fatally flawed."). Similarly, as discussed below, the four predicate acts of violence to persons or property depend on the viability of the extortion claims in this case. By holding that the defendants did not commit extortion, it necessarily follows that the four predicate acts also cannot support the RICO verdict. True, the Supreme Court expressly addressed the state law extortion claims and the Travel Act claims, but did not mention the four violence against person or property claims. But that is not surprising given that on appeal before the Supreme Court, the plaintiffs discussed those claims, and specifically argued that "even without the Hobbs Act predicates, the jury's verdict would stand on the 25 state extortion predicates." The plaintiffs, however, did not argue that the four predicate acts of violence against persons or property independently justified the jury's verdict. Therefore, the Supreme Court found no need to expressly address that question. But its holding that "all of the predicate acts supporting the jury's finding of a RICO violation must be reversed . . ." is conclusive.

One could argue that the Supreme Court made a mistake when it stated that "*all* of the predicate acts supporting the jury's finding of a RICO violation *must be reversed*," and that "*[w]ithout an underlying RICO violation*, the injunction issued by the District Court must necessarily be vacated." *Scheidler*, 537 U.S. at 411 (emphasis added). But if so, the appropriate procedure would have been for the plaintiffs to seek rehearing from the Supreme Court. This court cannot

ignore the Supreme Court's mandate merely because the Supreme Court might not have meant what it said.

Even assuming that the panel's remand order could be labeled a reasonable interpretation of the Supreme Court's opinion, the four predicate acts of violence to persons or property cannot, as a matter of law, constitute a violation of the Hobbs Act, as the plaintiffs argue. Specifically, the plaintiffs argue that the Hobbs Act makes it illegal to interfere with interstate commerce by: (1) robbery, (2) extortion, or (3) physical violence. The plaintiffs' argument is misplaced, as the plain language of the Hobbs Act makes clear.

The Hobbs Act provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951.

The plain language of the Hobbs Act makes clear that it does not make threats of "physical violence to any person or property" illegal. Rather, it prohibits threats of "physical violence to any person or property *in furtherance of a plan or purpose to do anything in violation of this section*." Thus, for the four acts or threats of violence to constitute a violation of the Hobbs Act, they must have been for purposes of obstructing, delaying or affecting commerce "by robbery or extortion." *United States v. Yankowski*, 184 F.3d 1071 (9th Cir. 1999); *United States v. Franks*, 511 F.2d 25 (6th Cir. 1975). Yet, the Supreme Court held that the facts in this case did not support a finding of extortion, as a matter of law. (And the plaintiffs do not make a claim of robbery.) Accordingly, there is no possible Hobbs Act violation and the remaining four predicate acts, like the Travel Act claims,

cannot, as a matter of law, support a RICO verdict.[2]

Nonetheless, on rehearing the panel unnecessarily sets up a debate on the meaning of the Hobbs Act, positing as plausible two different interpretations of the Hobbs Act— what the panel dubs a "two-way" and a "three-way" interpretation. *Scheidler* slip op. at 9. Using the panel's jargon, a "two-way" interpretation of the Hobbs Act allows for only two independent ways to violate the Hobbs Act: 1) Robbery or 2) Extortion. The three-way interpretation, according to the panel, provides for a third: 3) Physical violence to any person or property.

Although the panel refuses to resolve the debate and instead "underscore[s] the fact that we have not, at this point, ruled either implicitly or explicitly on the Hobbs Act issue,"

---

[2]  There is yet another reason that further proceedings on remand are unnecessary. In remanding the Hobbs Act question, the panel on rehearing instructs that "[i]f there is anything at all that is to be done, it must be based on the record that has already been built." Slip op. at 8. However, the record, as it currently exists, fails to establish that the four acts of violence involved interstate commerce. As the panel recognizes, slip op. at 13, the Hobbs Act violation must "affect[ ] commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). In this case, though, the jury did not determine that the four acts or violence affected commerce: The Special Interrogatories and Verdict Form did not ask the jury to decide separately whether each alleged predicate act involved interstate commerce. Rather, Special Interrogatory 8 asked whether "any of the acts that you found in Question 4 above affect[ed] interstate commerce?" The jury answered "yes" to that question, but the jury did not specify which of the acts listed in Interrogatory 4 affected interstate commerce. Interrogatory 4 included eight sub-components, (a) - (h), only one of which involved the acts or threats of physical violence to any person or property, which the remand order indicates remain viable. Because the jury did not specifically conclude that those acts affected interstate commerce, on the record as it stands, no Hobbs Act violation could exist.

slip op. at 7, the panel nonetheless states that "[g]ramma-tically, the text can be read either way without undue strain," *id.* at 9, and it concludes that "we see nothing absurd in the three-way interpretation the plaintiffs have urged." *Id.* at 16. However, contrary to the panel's conclusion, the three-way interpretation is not plausible given the plain language of the Hobbs Act. As explained above, the "physical violence to any person or property" clause of the Hobbs Act, states in its entirety: "or commits or threatens physical violence to any person or property in furtherance of a plan or purpose *to do anything in violation of this section, . . .*" Thus, the only way "physical violence" constitutes a violation of the Hobbs Act is if it (in addition to satisfying the interstate commerce requirement) is in furtherance of "robbery" or "extortion. *Yankowski*, 184 F.3d 1071; *Franks*, 511 F.2d 25. Clearly, under the Hobbs Act, physical violence to any person or property is confined to furthering robbery or extortion. It does not stand alone as a separate violation. The full court should decide this clear question of law now, instead of presenting competing theories for the district court to resolve on remand.

Although an order for a reversal and remand from the Supreme Court is not the typical case for which *en banc* is appropriate, procedurally that is the only option available to the defendants before this court. Given the age of this case, remanding to the district court unnecessarily wastes additional judicial resources. Granted, it is hard to see how four acts of violence committed nearly twenty years ago—and well before Congress enacted the Freedom of Access to Clinic Entrances Act—would justify an injunction in 2005. It is likely and certainly appropriate that the district court will dispose of the case promptly on that basis. But even that most likely result requires additional resources of the parties and the judicial system. This is unnecessary because the Supreme Court's holding that there was no extortion means that no Hobbs Act violation possibly exists. More-

over, if the district court on remand somehow finds an injunction appropriate, then it will be required to choose between the two legal options the panel presents. The losing side would surely appeal, presenting the pure issue of law that this court would have resolved by now had we considered it en banc.

Absent a writ of mandamus from the United States Supreme Court, *see In re Blodgett*, 502 U.S. 236, 240-41 (1992) (denying a petition for the writ of mandamus directed toward the Ninth Circuit without prejudice, but stating that such relief would be available if the circuit court caused an unwarranted delay in the case's disposition), the defendants face an unnecessary remand. I therefore DISSENT from the denial of rehearing en banc. *Id.*

A true Copy:

      Teste:

 

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*